## RICHARD T. FOARD v. GEORGE M. McANNELLY, Appellant.

### Division One, December 23, 1908.

1. **EJECTMENT: Mistake as to True Line.**   There is a wide difference between an agreed line, and a mistaken line which had been considered and acted upon by the adjoining owners as the true dividing line.   And where they had a survey made and afterwards one of them built a fence on the line so run, and each held thereafter to that line, but with no agreement that it was to be accepted as the true line, neither is estopped from claiming to the true line when it is later ascertained and established.   The agreement itself must be made to appear before mere use to a mistaken line, surveyed in an attempt to ascertain the true line, can be used to estop either adjoining owner from later claiming to the true line; and in this case there is no evidence that tends to establish such an agreement.

2. ————: ————: **Estoppel.**   Where there is no agreed line, the building of a fence by defendant upon a mistaken line ignorantly supposed by both adjoining owners to be the true line, and the cultivation and continued use and possession of the ground up to that line by defendant, with no misleading of defendant to his injury by plaintiff, do not estop plaintiff from claiming to the true line.

3. ————: **Limitation: Adverse Possession.** The possession of the land if not adverse, however long, does not ripen into title; and where the defendant testified that he only claimed to the true dividing line whatever it might be, his possession, though for more than ten years, was not adverse. And where the evidence is conflicting as to whether defendant claimed to be the owner, whatever the true line might be, or claimed to own only to the true line, wherever that was, the question of limitations, though the possession was longer than ten years, should be submitted to the jury.

Appeal from Texas Circuit Court.—*Hon. L. B. Woodside,* Judge.

Affirmed.

*L. D. Grove* for appellant.

*Lamar, Barton & Lamar* for respondent.

(1) The possession of coterminous proprietors under a mistake or ignorance of the true line and without intending to claim beyond the true line will not work a disseizin in favor of either. Finch v. Ullman, 105 Mo. 255; Schad v. Sharp, 95 Mo. 573; Crawford v. Ahrens, 103 Mo. 88; Houx v. Batteen, 68 Mo. 84; St. Louis University v. McCune, 28 Mo. 481; Battner v. Baker, 108 Mo. 311; Schwartzer v. Gebhardt, 157 Mo. 99. (2) There was no evidence of an agreed line. Patton v. Smith, 171 Mo. 231. This is conclusively shown by the fact that Meador deeded to defendant describing his land by the survey line without referring to any agreement. Patton v. Smith, 171 Mo. 240. (3) Conforming to an erroneous line in good faith believing it to be the true line, and intending to claim only to the true line, does not estop the adjoining owner, however long the possession of the other may be, from claiming to the true line when it is ascertained. Patton v. Smith, 171 Mo. 231. (4) The defense of "innocent purchaser" is an affirmative allegation and the burden of proving it is upon defendant. Young v. Schofield,

132 Mo. 650; Holdsworth v. Shannon, 113 Mo. 525. (5) Defendant cannot complain of the court's refusal to submit the McSpadden survey because he was benefited by it. (6) As there was no evidence of an agreed line, acquiescence or innocent purchaser, these matters were properly taken from the jury.

GRAVES, J.—The petition is an ordinary petition in ejectment for the following strip of land in Texas county:

"Beginning at the northwest corner of section nineteen in township thirty, range nine west, in Texas county, Missouri, thence running east on said section line thirty-seven chains to a fence, thence running south one hundred and twenty-two links, thence running west with a fence thirty-seven chains, thence running north one hundred and twenty-two links to place of beginning; thence running north ten links to the northeast corner of section twenty-four, in township thirty, range ten, thence running west on the section line of section twenty-four, five hundred and twenty-five links, thence running south one hundred and thirty-two links to a fence, thence running east five hundred and twenty-five links with a fence, thence north one hundred and thirty-two links to the place of beginning."

Ouster was laid as of April 2, 1905, damages claimed in the sum of five dollars, and monthly rents and profits alleged to be $1 per month. We set out the answer more fully, for in so doing it assists in the statement of facts shown upon the trial. In the answer we find first a general denial. Then follows this language:

"For a further answer says: That plaintiff ought not to have or maintain his action, but should be stopped from setting up or maintaining the same for the following reasons: that the fence running east and west, described in the plaintiff's petition, was

built more than twenty years ago by one R. B. Meador, who was then the owner of the south half of southwest quarter, section eighteen, township thirty, range nine, and the southeast quarter of the southeast quarter, section thirteen, township thirty, range ten west, and in the possession of the same, and this plaintiff then being the owner of, and in possession of the tract of land lying directly south thereof, and who by agreement joined in the building of said fence mentioned in plaintiff's petition, as and for a division fence between their several tracts of land, which has ever since that time been used by the said plaintiff and the said R. B. Meador up to about the seventh day of September, 1904 (as a division fence dividing this respective tract of land), at which time this defendant purchased the said land (described in petition) from the said R. B. Meador, and immediately thereafter went in the possession thereof.

"Defendant alleges that from the time of the building of the said fence at the time and in the manner, and for the purpose aforesaid, the said Meador and the said plaintiff believed and considered the said fence to be the true boundary line dividing the said tracts of land owned then by the said plaintiff and the said Meador, and immediately after the building of the said fence the said Meador commenced to clear up, cultivate and improve the said land (described in the petition) and laid out and expended a large amount of money and labor in improving the same (all the time claiming the same as his land), and has ever since that time occupied the same and remained in undisputed possession thereof until the said 7th day of September, 1904; paid all taxes assessed thereon; all done in the belief that the said fence was the true line dividing their respective tracts of land, and further says that all the improving on the said land was done with the knowledge, consent and approval of the said plaintiff, and under the full belief that

the said fence marked the line of division as aforesaid.

"Defendant further alleges that about the first of June, 1904, he commenced negotiations with the said Meador for the purpose of ultimately purchasing the said land, and while the same was in the actual occupation of the said Meador as aforesaid, and which fact of such contemplated purchase by defendant of the said land was well known to this plaintiff, and well knowing the same to be claimed by the said Meador, remained quiet and permitted this defendant to purchase same, the plaintiff well knowing that defendant believed that the said fence would mark the boundary of the said tracts between plaintiff and defendant in case he should purchase same.

"Defendant alleges that afterwards and on 7th day of September, 1904, he did purchase the same, and received a deed from the said Meador for the said land owned by the said Meador as aforesaid, still believing that the said Meador was the owner of all the land of which the said fence formed the south boundary line, and paid for the said land a valuable consideration, all of which he would not have done except in the belief that he was entitled upon the said date to all the land up to the said fence.

"The premises being considered, the plaintiff should be estopped from claiming the possession of the said land or any part thereof."

The record discloses no reply, but the case proceeded as if one of general denial of new matter had been filed.

From the foregoing answer it appears there was a doubtful or disputed boundary line between Meador and Foard. The defendant is Meador's grantee.

There are three different surveys testified to in the evidence. One by George Paulding in 1884, one by S. S. Roark, county surveyor of Texas county, in 1901, and a third by L. C. McSpadden, surveyor of

Dent county, a year or more later. In the latter survey, Mr. Roark assisted. The Roark survey fixed the line north of the Paulding survey, and the McSpadden survey very slightly to the north of the Roark survey. It might be well to state that Paulding seems to have been the deputy surveyor of one Brown. The fence described in the petition is on the line of the Paulding survey, and the land sued for and recovered is the strip between the fence and the Roark survey. As to how the several surveys were made is fully in evidence. By this we mean the parties describe their work fully, both as to what Government land marks were found and what were not found.

There is also a deed in evidence from Meador and wife to R. T. Foard, conveying a small tract of land in section nineteen, which was south of the line, whatever it may be, and in this deed made by Meador the land is described by Government numbers, with nothing to indicate an agreed boundary line. This deed was in 1899, some four years after the Paulding survey.

The evidence upon one of the disputed questions, i. e., as to whether or not there was an agreed line, can be best stated in their own language. Mr. Foard says:

"Q. You have seen and read and heard read a description of the land described in this petition, have you not? A. Yes, sir.

"Q. I will ask you who was in possession of this land when this suit was filed on April 14, 1905; who was in possession of it or had it in possession of that date? A. I had it in possession in my deeds.

"Q. Who had it under fence? A. George H. McAnnelly.

"Q. How much of that land is in cultivation if you know? A. Five or six acres.

"Q. What is the rental of it worth a year? A. Well, now, I suppose it would be worth $2 a year.

"Cross-examined by Mr. Grove:

"Q. Did you ever have possession of it? A. I suppose I had possession of it before it was fenced. I had a deed to it.

"Q. When was it fenced? A. Well a part of it was fenced about the year 1884 or afterwards.

"Q. Who built the fence? A. Meador.

"Q. All of it? A. Yes, sir, he built all of the first fence.

"Q. Did not you fence a part of it, build a part of the fence between you and Meador? A. I don't think that I built any part of the fence which is in dispute; I repaired the fence.

"Q. After Mr. Meador had built a part of the fence there did not you take it up then and build on east? A. No, sir, Mr. Meador had a fence there.

"Q. When you bought the land? A. When I bought the land, yes, sir.

"Q. You did not buy all of the land from him, did you? A. No, sir.

"Q. Now at the time you bought this piece of land from Meador that you speak of, there was a fence on that land fencing in some land still further south of this strip? A. Yes, sir, and a cross fence running across.

"Q. And after you bought that land you moved your fence on a line with this fence did you not? A. I think he moved it.

"Q. But anyway it was moved? A. Yes, sir. Now for you to understand me Mr. Meador cleared all of this land that was under fence long before I ever cleared any of my land to that fence.

"Q. Did you ever have a talk with Mr. Meador about the line fence? A. Mr. Meador made, several years afterwards, a proposition to me that he would divide the fence and give me choice, I could either take the east end of the road or the west side and I took the west side.

"Q. You have kept that part of the fence up since? A. Yes, sir.

"Q. That was more than five years ago, was it not? A. I could not tell you the date of it.

"Q. After the building of that fence in '84 or '85 or '89, whichever the case might be, did or did not Mr. Meador take possession of all that land north of the fence? A. Mr. Meador built the fence over there that was in question.

"Q. Did or did not he clear up that land after the fence was built? A. No, sir, he cleared the land before the fence was built.

"Q. Did you know at the time he was clearing the land that he was doing so? A. Of course, I knew that he was clearing it.

"Q. Has he remained in possession of the land from that time to the time that he sold Mr. McAnnelly, cultivating it yearly? A. Yes, sir.

"Q. Did you or did you not, in any way, question his right to the possession of that? A. When the true line was set up I questioned his right there and Mr. Meador told me that he did not own any land in section 19 or 24 nor he did not claim any, and the fact was that when Mr. Meador sold to Mr. McAnnelly I saw his deed and Mr. Meador did not deed him any land in sections 19 or 24.

"Q. But at the time that Mr. McAnnelly bought it this fence was in the same position that it had been for thirty years? A. Certainly.

"Q. Mr. Foard, did you and Mr. Meador along in 1884 or 1885 have a survey made, by a Mr. George Paulding, deputy county surveyor of Texas county? A. Mr. Meador had a survey made by Mr. George Paulding and he also told me that Mr. Brown had surveyed it before; I don't know anything about it only what Mr. Meador said.

"Q. You was present at the survey made by Mr.

George Paulding was you not? A. I was part of the time.

"Q. And the fence is on the line now that was pointed out by Mr. Paulding at the making of that survey, is it not? A. Yes, sir."

Mr. Meador tells it thus:

"Q. Where did you live from the year 1882 up till about a year ago? A. I lived out two miles southwest of Houston in section 18, township 30, range 9.

"Q. When did you move on and take possession of the land described in this deed from Anderson to yourself? A. In 1882.

"Q. How long did you live there? A. I lived there from '82 to December, 1904.

"Q. You was in possession of this land all this time, was you? A. Yes, sir.

"Q. I will ask you to state to the jury about what time you placed a fence on the south side of your farm? A. At different times; I cleared the land up at different times. The first I cleared up in the spring and crossed the line on the Anderson farm about fifteen yards, not knowing where the line was—

"The plaintiff objected to any testimony on the part of Mr. Meador as to acquiring title by limitation to that twenty acres in 18, for the reason he made a warranty deed to it and he would be estopped; which objection was by the court overruled.

"Q. Tell the jury when you built that fence, that is described in the petition here, between sections 18 and 19? A. I built part of it in 1883.

"Q. Tell the jury what you did in reference to ascertaining the boundary line between you and Mr. Foard before you built the fence? A. Before we built the fence there was nothing said about it. We thought I was building about on the line.

"Q. Tell the jury what you did to ascertain the line? A. By agreement with Mr. Foard we employed Mr. Paulding to run the line.

"Q. Tell the jury what you did in reference to that matter; who first mentioned having this surveyed? A. Mr. Foard and I talked the matter over to have it made between us and he employed Mr. Paulding to come and make the survey because he said Mr. Brown was not as good a surveyor as Mr. Paulding and I wanted Mr. Brown, the county surveyor.

"Q. Tell the jury what you did in reference to building the fence on that survey? A. After the survey was made I cleared the land up at different times; I just fenced the land that Mr. Paulding surveyed for us.

"Q. You built the fence on that line? A. Yes, sir, we told him to establish these corners when he came to run the line.

"Q. State to the jury whether or not the fence that is described in this petition is the fence that you then built and whether or not it is on that survey? A. Yes, sir.

"Q. I will ask you to tell the jury whether or not Mr. Foard was present when that survey was made? A. Yes, sir.

"Q. Tell the jury whether or not you took possession of the land north of that fence and when you took possession of it? A. Well I took possession of it from the time that Mr. Paulding made the survey.

"Q. How long did you hold possession of it? A. Why, from the time he made the survey up until this last December.

"Q. What did you do with the possession then? A. I sold it to Mr. McAnnelly.

"Q. State whether or not Mr. Foard ever objected to that survey? A. I never heard a word until two years ago when Mr. Roark came in there and changed the line.

"Q. Tell the jury if you was cultivating and improving that strip of land on that side of the fence? A. Yes, sir.

"Q.   When?   A.   The first in 1882.

"Q.   When was the last part?   A.   It has been about ten or twelve years ago the last was fenced.

"Q.   Now you state you built the first fence, I will ask you to state to the jury whether or not Mr. Foard ever extended that fence in any direction?   A. Mr. Foard and I swapped pieces of land on it, a forty acres north of the line in dispute and I had one forty acres south of the line and I traded him twenty acres of that forty for the one of the north with the understanding we was to trade to these corners established there and we thought these were the proper lines.

"Q.   What was said between you and Mr. Foard in regard to that matter?   A.   There was nothing said, only we just traded.

"Q.   What was said about it?   A.   I could not say what was said only the trade was made you know and we traded a certain piece of land for a certain piece of land.

"Q.   Tell the jury whether or not there was a fence that had been built on the land that you traded Mr. Foard and if so where that fence was?   A.   The fence had been built on the land that I traded to Mr. Foard, there was two fences, there was a cross fence and an outside fence.

"Q.   I am speaking of the fence that runs parallel with this fence.   A.   It was south of the line.

"Q.   Where was that fence?   A.   It was on the twenty acres that I traded to Mr. Foard, nearer to Mr. Foard than it was to my house.

"Q.   What did Mr. Foard do with the fence after he purchased it?   A.   He moved the fence back on the line that Mr. Paulding made and he extended the fence on east.

"Q.   On the same line that Mr. Paulding had established?   A.   Yes, sir.

"Q.   State whether or not that was an extension

of the fence that you built on east on a straight line. A. Yes, sir.

"Q. When did Mr. Foard build that extension? A. I don't know that I can call the years when I swapped back with him. It was either that year or the next year, I don't know whether I had the place in cultivation or not, the twenty acres, it was sometime within a year after I had made the trade when the fence was moved.

"Q. State to the jury whether or not you have always claimed title to this land up to this fence.

"The plaintiff objected to this question; which objection was by the court overruled.

"A. Yes, sir.

"Q. From what time did you commence claiming it? A. From 1882; that was the time we moved over, and we did not know whether the line was exactly, but we claimed down to where the line was.

"Q. Tell the jury what act or acts Mr. Foard did in recognizing that fence as being the true boundary line between your land and his.

"The plaintiff objected to this question, which objection was by the court overruled.

"A. I never heard any objection from Mr. Foard about it being the true boundary line.

"Q. I will ask you to state to the jury who has kept up that fence?

"The plaintiff objected to this question for the reason it would have no tendency to prove or disprove the line, which objection was by the court overruled.

"A. Me and Mr. Foard was coming up the road one day and we was talking about the fence and he said I will give you the choice side of this road to keep the fence up; I could have the east side and he would take the west side and he agreed that he would rather take the west side and I took the east side and we have kept it up ever since.

"Q. When was that arrangement made? A. Fifteen years ago or more.

"Q. Now, I will ask you, you spoke of a road, what road is that? A. That is the Mountain Grove and Houston road.

"Q. It runs through these premises? A. Yes, sir.

"Q. State to the jury whether or not the two fences on the east side and on the west side of the road were on a line with each other? A. Yes, sir, they were on a line parallel east and west.

"Q. I will ask you whether or not Mr. Foard has built any new fences on that same line? A. Yes, sir.

"Q. When did he build them? A. Why, it has been four or five years ago.

"Q. That was before the Roark survey was it? A. Yes, sir.

"Q. Was that fence on a line with the fence you originally built? A. Yes, sir; the old fence was moved away and a new fence was put there.

"Cross-examination by Mr. Lamar:

"Q. You spoke of claiming to the fence, you simply claimed to the fence because you thought the fence was on the line? A. Yes, sir.

"Q. You did not at any time claim to own any land in 24, did you? A. Not at the present time, but before that time I had owned land in 19, but I didn't never own any land in 24.

"Q. You did not consider that you was selling any land in 24 to Mr. McAnnelly? A. No, sir.

"Q. You only claimed to the fence because you thought the fence was on the line? A. Yes, sir.

"Q. Now as a matter of fact was not there some doubt as to where the real line was? A. No, sir; I never heard any doubt until Mr. Roark came up there.

"Q. You spoke, a while ago, about you and Judge

Foard having an agreement ago about keeping up this fence? A. Yes, sir.

"Q. There is a part of the fence east of the lane and a part of the fence west of the lane? A. Yes, sir.

"Q. And the agreement between you and Foard was that he was to take the fence west of the lane and you was to take the fence east of the lane and keep the fence up? A. Yes, sir.

"Q. At the time there was no talk about the fence being on the line? A. No, sir; we supposed it was on the line.

"Q. Was there anything said by you and him at the time the deed was made further than you sold the land in this description? A. We traded to the corners.

"Q. Did you go and look at the corners or say anything about the corners? A. The thing had been talked over about where the corners were.

"Q. At the time you sold to him you just sold him what land you had in 19? A. We just swapped.

"Q. And he deeded you what land he had in 18? A. Yes, sir."

The evidence in addition shows that from time to time Meador fenced the land he used to the north of the fence and was so using it when he sold to the defendant. The defendant was not a witness at the trial and as to whether he was advised as to the controversy arising after Roark's survey does not appear. Upon these facts, the court instructed as we take it, upon its own motion, as follows:

"The plaintiff in this case sues the defendant for a strip of land 122 links wide and along the north side of section 19, township 30, range 9, and section 24, township 30, range 10.

"2. The deeds produced in evidence are sufficient to convey the title to plaintiff to all the lands in said sections 19 and 24 that is described in the petition, and

if you find from the evidence that the defendant was at the time this suit was commenced in possession of any part of the lands in said section 19 and 24 described in the petition, you will find the issues for the plaintiff, unless you further find that the defendant and those under whom he claims has acquired title thereto by limitation.

"3. If you find from the evidence that the land on the north side of said sections 19 and 24 have been surveyed at different times and that such surveys do not agree, then it is the province of the jury to determine from the evidence as to which of said surveys is correct.

"4. Although you may find from the evidence that the survey made by Roark is correct, still if you further find from the evidence that prior to said survey the said line was surveyed by one Paulding and the line in question was located and designated by said Paulding and if the witness Meador was at said time owner of the said land at said time, north of said line, and after such survey took possession of the said land to the line designated by Paulding, and claimed to own the land up to such line designated by Paulding, and if under such claim of title he held the open, notorious and adverse possession of the said land for a period of ten years prior to the 14th day of April, 1905, then you will find the issues for the defendant; and in such case if the defendant bought Meador's land believing that the same extended to the said line, so marked or designated by Paulding, and was put by Meador in possession thereof, and has since the purchase held the adverse, open and notorious possession of the same, claiming title thereto, then the period of his possession prior to April 14, 1905, may be considered and included with that of Meador in estimating such period of ten years' possession prior to April 14, 1905."

215 Sup—25

Verdict and judgment for plaintiff and defendant appeals.

I.   That plaintiff and defendant occupied their respective lands after the Paulding survey upon the supposition that it was the true line, is quite apparent from the testimony of both parties.   That the fence was constructed by Meador on this supposed true line is practically undisputed.   That some years later plaintiff and Meador divided their fence for purposes of repair is agreed.   But inasmuch as a peremptory instruction upon all the evidence was asked by defendant and refused by the court, we are forced to say whether or not this evidence so far indicates an agreed line, i. e., a line agreed upon by the parties, rather than the supposed right line, as to authorize such an instruction.   And we are forced to pass upon the probative force of this evidence, by still another instruction asked by defendant and refused by the court.   By instruction numbered 3 the defendant sought to have the court submit the question to the jury in this language:

"The court instructs the jury that if you find and believe from the evidence, that plaintiff and R. B. Meador agreed that the line dividing their respective premises should be located by one George Paulding, a surveyor, and that in pursuance of such agreement the said Paulding located the line where the fence described in plaintiff's petition was built and now stands, and that plaintiff and Meador accepted such survey as the dividing line between their respective premises, then it became the true line and you should find the issues for the defendant, although you may believe that said survey was not on the section line or Government survey."

By its refusal to give this instruction, the court in effect said that there was not sufficient evidence to submit the case to the jury as to whether there was an

agreed line, rather than a mistaken supposed line.   As
we take it there is a vast difference between an agree-
ment as to what shall be the division line, and a mere
supposed division line which has been acted upon by
the parties, with no intention of claiming further than
the true line.   The authorities upon the two classes of
cases are reviewed and discussed by BRACE, J., in
Schad v. Sharp, 95 Mo. 573.   If the evidence in this
case shows or even tends to show that the fence line
was agreed upon by plaintiff and Meador as the true
line, then to say the least, the court erred in refusing
instruction number three as asked for by defendant.
In the case just cited, quoting from another case, it
is said:

"  'It is the well-settled law in this State that when
two adjoining proprietors are divided by a fence which
they suppose to be the true line, each claiming only to
the true line, they are not bound by the supposed line,
but must conform to the true line when ascertained.'
[Jacobs v. Moseley, 91 Mo. 457; Tamm v. Kellogg, 49
Mo. 118; Thomas v. Babb, 45 Mo. 384.]   Their pos-
session under mistake or ignorance of the true line di-
viding their premises, and without intending to claim
beyond the true line when discovered, will not work
a disseisin in favor of either party.   [Houx v. Batteen,
68 Mo. 84; St. Louis University v. McCune, 28 Mo.
481.] "

And on the other line of cases, the same case like-
wise quotes and comments as follows:

"The true principle to be deduced from Taylor
v. Zepp, 14 Mo. 482; Blair v. Smith, 16 Mo. 273, and
Turner v. Baker, 64 Mo. 218, to which we are cited as
an authority for these instructions, is thus stated in
Jacobs v. Moseley, supra: 'Where there is a dispute
as to the true division line between adjoining proprie-
tors, or the line is uncertain, and they are both igno-
rant as to its true location, and they fix and agree
upon a permanent boundary line and take possession

accordingly, the agreement is binding on them and those claiming under them.' In this case both plaintiff and defendant were ignorant of the true line. The only information they had on that subject was that derived from Parks, who told them 'that the fence was on the line or near to it,' and there is not a scintilla of evidence of any agreement between them that the German line should be the boundary line between them, regardless of the actual location of the true line. . . . We think there was no error in refusing these instructions. In actions at law the Supreme Court will not pass upon the weight of the evidence. [Webb v. Webb, 87 Mo. 541.]''

We must, therefore, determine from this testimony whether or not there was an agreement between these parties as to a division line. Does the testimony of Foard and Meador so show? If it tends to so show, the instruction numbered 3 should have been given and the question submitted to the jury for its determination of a disputed fact. Under the law mere possession is not sufficient to show the agreement. The agreement itself must be made to appear. There is a dispute in this evidence as to who had Paulding make this survey. Plaintiff says Meador procured the survey to be made and he was present a part of the time, and Meador says that plaintiff insisted upon Paulding, the deputy surveyor, making it, because he was a better surveyor than his principal, the county surveyor. But does this testimony go further than to show that the parties were trying to ascertain the true line, rather than make an agreement as to what should be taken as a true line in case of a disputed line? We think not. Then corroborative of this idea, Mr. Meador on cross-examination says that he only claimed to the fence on the theory that the fence as built by him was on the true line. The only actual agreement he testifies to is one made some years later as to which portion of the fence should be kept in repair by the respective

parties. This agreement is not inconsistent with the idea that the parties were acting upon a supposed true line, rather than upon an agreed true line. We have set this evidence out in full for the reason that the action of the court in refusing this instruction is a close one, but we are not of the opinion that the evidence is such as to have authorized the trial court to submit the question to the jury. There is no evidence that the parties specifically agreed beforehand that Paulding should make the survey, and when it was so made, it should be considered as the true line between the parties. Without such explicit testimony we think the action of the trial court right, both in refusing the demurrer and the said instruction numbered three, supra.

II. If there was no agreement between plaintiff and Meador as to what should be considered the true line, as we have just found that there was not, then can the plea of estoppel as set out in the answer prove availing? This question was not submitted by the trial court in the instructions given. This question is squarely presented by defendant in instruction numbered 4, which was asked but refused. The instruction reads:

"The court instructs the jury that if you find from the evidence that the fence described in plaintiff's petition was built by plaintiff and R. B. Meador in 1884 and was by him and the said Meador regarded and treated at the time of the building thereof as and was built for a fence dividing land owned by them, and that said Meador believed said fence to mark the southern boundary of his land, and so believing took possession of the land described in the petition, cleared up at his expense the same, expended money and labor thereon in improving the same, believing at the time he expended such money and labor that the fence was the true boundary line and that the land was a part of

his land, and that he would not have made such improvements if he had believed the land was not his own, and that the defendant at the time of his purchase from Meador believed that the fence was the true boundary line forming the southern boundary thereof, then the plaintiff is estopped from maintaining this action, and you will find for the defendant.''

It may also be raised by the instruction in the nature of a demurrer to the testimony, but as it is squarely raised in the instruction quoted it is not necessary to discuss the other point. This again forces us to the evidence. Plaintiff says that Meador first cleared the land, and then built the fence. The evidence of Meador does not materially alter the situation. Among other things, he says: .

''Q. Tell the jury what you did in reference to building the fence on that survey. A. After the survey was made, I cleared the land up at different times, I just fenced the land that Mr. Paulding surveyed for us.

''Q. You built the fence on that line? A. Yes, sir, we told him to establish these corners when he came to run the land.

''Q. State to the jury whether or not the fence that is described in this petition is the fence that you then built and whether or not it is on that survey. A. Yes, sir.''

It must be borne in mind that we are dealing now with the question of estoppel, and that too in the absence of an agreed line. If the evidence had disclosed a division line agreed upon by the parties, and in addition the doing of some act, by one of the parties, in pursuance of such agreement and understanding, which act was induced by the conduct as expressed in the agreement, and which act was detrimental to the party, then we can see elements of *estoppel in pais*. But on the other hand, if the building of the fence, the plowing and cultivation of the ground, and the continuous use and possession thereof, which are the

acts involved here, were superinduced by the mistaken view, entertained by both parties, that the supposed line was the true line, and we repeat without it being an agreed line, then, under our holdings, we see no elements of *estoppel in pais*. In such case there is no willful misleading of one party by the other to his detriment. If the plaintiff had, as a matter of fact, known the true line, and by either acts or words so conducted himself as to have misled Meador, to his detriment, then a different question would be here.

In 16 Cyc. 733-4, the rule is stated thus: "No estoppel arises where the representation or conduct of the party sought to be estopped is due to ignorance founded upon an innocent mistake. So the acts or declarations of a party based upon an innocent mistake as to his legal rights will not estop him to assert the same. Ignorance or mistake if it arises from culpable negligence will not prevent an estoppel." Further at page 741 of the same volume, we find this wholesome rule: "There can be no equitable estoppel short of one arising from actual contract, where the truth is known to both parties or where they both have equal means of knowledge."

In addition it is elementary that representations and acts upon which estoppel is predicated must be prior to the acts alleged to be detrimental to the interest of the other party. With these general rules in view, and if we hold, as we have in the first paragraph hereof, that there was no contract or agreement as to a division line, then we can see nothing in this plea of defendant under the evidence. Meador knew as much about the true line as did plaintiff, and in this case, Meador's shoes are defendant's shoes. Eliminating the question of an agreed or contract division line, no acts of plaintiff were sufficient in law to justify the plea of *estoppel in pais*. This point will therefore be ruled against defendant.

III.  The court instructed upon the question of adverse possession.  Upon this question there is some evidence from parties other than Meador, that he, Meador, always claimed the land to the fence.  That he used and cultivated it for the statutory period of limitation cannot be questioned, but in his testimony he does not go quite so far as some other witnesses.  He says, upon cross-examination:

"Q.  You spoke of claiming to the fence, you simply claimed to the fence because you thought the fence was on the line?  A.  Yes, sir.

"Q.  You did not, at any time, claim to own any land in 24, did you?  A.  Not at the present time, but before that time I had owned land in 19, but I never did own any land in 24.

"Q.  You did not consider that you was selling any land in 24 to Mr. McAnnelly?  A.  No, sir.

"Q.  You only claimed to the fence because you supposed that the fence was on the line?  A.  Yes, sir.

"Q.  Now, as a matter of fact, was not there some doubt as to where the real line was?  A.  No, sir, I never heard any doubt until Mr. Roark came up there.

"Q.  You spoke a while ago about you and Judge Foard having an agreement many years ago about keeping up this fence.  A.  Yes, sir.

"Q.  There is a part of the fence east of the lane and a part of the fence west of the lane?  A.  Yes, sir.

"Q.  And the agreement between you and Foard was that he was to take the fence west of the lane and you was to take the fence east of the lane and keep the fence up?  A.  Yes, sir.

"Q.  At that time there was no talk about the fence being on the line?  A.  No, sir, we supposed it was on the line."

To our mind the question of adverse possession, under all the evidence, should have been submitted to

the jury for their determination. Meador goes no further than to say that he and plaintiff supposed the fence was on the true line, and that he did not think of selling land in section 24 to defendant unless the fence was the true line. In a case calling for a discussion of this kind of a question, Battner v. Baker, 108 Mo. l. c. 314, BLACK, J., said: "The question on these agreed facts and the evidence is whether the defendant has acquired the land sued for under the Statute of Limitations. That defendant has been in actual possession of the strip of land for more than the statutory period of time, is conceded. The question, therefore, is whether his possession has been adverse to the true owners. Where adjoining landowners are divided by a fence, which they suppose is the true line, each claiming only to the true line, wherever that may be, they are not bound by the supposed line, and must conform to the true line when it is ascertained. [Jacobs v. Moseley, 91 Mo. 457; Schad v. Sharp, 95 Mo. 574; Krider v. Milner, 99 Mo. 145; Skinker v. Haagsma, 99 Mo. 209.] 'Their possession under mistake or ignorance of the true line dividing their premises and without intending to claim beyond the true line when discovered, will not work a disseizin in favor of either party.' [Schad v. Sharp, supra.] But where one takes and holds possession up to a fence, and claims to be the owner up to it, his possession will be adverse, and this, too, though he may believe the fence to be on the true line, when, in point of fact, it is not on the true line. [Cole v. Parker, 70 Mo. 379; Handlan v. McManus, 100 Mo. 125.] The distinction between these rules lies in the fact whether the party claimed only to the true line wherever that might be, or to the fence."

In the case at bar the testimony of Meador only tended to prove that he claimed to the true line wherever that might be, and this is borne out by the testimony of the plaintiff.

In other words under this testimony there is absent an agreed division line, and there are present no such facts which would authorize a court, as a matter of law, to say that there was adverse possession for the statutory period. It then becomes a question for the jury, which we think has been properly submitted in the instructions given.

These questions cover all the points of sufficient merit for a discussion in this opinion.

From the conclusions reached, it follows that the case should be and is affirmed. All concur.