## J. W. CHILTON et al., Appellants, v. SEBASTIANNI COMANIANNI et al.

**Division Two, June 29, 1909.**

1. **ADVERSE POSSESSION: When Not Question for Jury.** Ordinarily adverse possession is a question of fact for the determination of the jury; but where the paper title is clearly in the plaintiffs, and the evidence to establish such possession in defendants as the law requires to divest the title of the true owner, is wholly insufficient, it is the duty of the court to declare as a matter of law that it is insufficient, and to direct a verdict for plaintiffs.

2. ———: **Paying Taxes, Etc.** Paying taxes on the land, and having an agent to look after trespassers and the timber on the land, is evidence of a claim of ownership, but not of adverse possession.

3. ———: **Cutting Timber.** A contract by which defendant sold to third parties the timber on the land and under which within two or three years they removed the timber and wood, but did nothing more, is not sufficient to establish adverse possession in defendant.

4. ———: **License.** The permitting of a woman to live in a cabin on the timber land for three years without paying rent, and the cultivation by her of a garden spot thereon, she being neither a tenant nor a lessee, and the house having been built by a trespasser, does not tend to establish adverse possession; especially, where the claimant knew nothing about her occupancy of the house until after she had vacated it.

Appeal from Shannon Circuit Court.—*Hon. W. N. Evans,* Judge.

REVERSED (*with directions*).

*J. W. Chilton* and *James Orchard* for appellants.

(1) A deed made by a grantor who has previously sold the same land by deed which has been recorded before the execution of such second deed, is an absolute nullity and conveys no title. This is A B C law and needs the citation of no authorities to support it. Where, in a tax suit, service of process is had only by order of publication against the record owner of land by the initial letters of his name (the land standing of record in his full Christian name), the court acquires no jurisdiction of such defendant, the judgment is void, and a deed founded thereupon is likewise void and conveys no title to the purchaser. Spore v. Ozark Land Co., 186 Mo. 656; Vincent v. Means, 184 Mo. 329; Evarts v. Mo. Lbr. and Mining Co., 92 S. W. 372; Turner v. Gregory, 151 Mo. 100. (2) Adverse possession, under color of title, in order to ripen into title under the ten-year limitation statute, must have been actual, open, notorious, exclusive, adverse, hostile and continuous in the claimant or those under whom he claims, as against the true owner, for a period of ten consecutive years. A hiatus in the possession will stop the statute. Dalby v. Snuffer, 57 Mo. 294; St. Louis v. Priest, 103 Mo. 655; Brown v. Hartford, 173 Mo. 183; Sedgwick & Wait, Trials, sec. 729; Nye v. Alfter, 127 Mo. 529. (3) To sustain the affirmative plea of the thirty-year Statute of Limitations (Sec. 4268, R. S. 1899), the following (among other things), must be proved by the party asserting and relying upon such plea, to-wit: 1. The premises must not have been in the possession of the true owner nor any one under whom he claims for thirty consecutive years. 2. No taxes must have been paid on the land by the true owner nor by any one under whom he claims, for thirty consecutive years. 3. The original owner must have failed to bring his action within one year succeeding the thirty-year period referred to.

4. The pleader must have been in lawful possession of the land one year after the expiration of the thirty-year period referred to. Fairbanks v. Long, 91 Mo. 633; Rollins v. McIntyre, 87 Mo. 515. Payment of taxes, cutting of timber and keeping off of trespassers are acts not of themselves ordinarily sufficient to constitute actual possession within the meaning of the law, especially in the absence of actual notice to the true owner. Pharis v. Jones, 122 Mo. 131; Nye v. Alfter, 127 Mo. 529. (4) When the verdict of a jury is unsupported by evidence, or is the result of erroneous instructions from the court, this court will set aside or reverse a judgment founded thereupon. Mosris v. Barnes, 35 Mo. 412; Pipkin v. Allen, 24 Mo. 520; Robbins v. Phillips, 68 Mo. 100.

*A. E. McGlashan* for respondents.

(1) The instructions of the court correctly declared the law as to what constitutes possession. Draper v. Shoot, 25 Mo. 203; Leeper v. Baker, 68 Mo. 400; Fugate v. Pierce, 49 Mo. 441; Turner v. Hall, 60 Mo. 271; Mississippi Co. v. Vowels, 101 Mo. 225; Cook v. Farrah, 105 Mo. 493; Goltermann v. Schiermeyer, 111 Mo. 405, 125 Mo. 302; Brown v. Hartford, 173 Mo. 183. (2) The evidence is sufficient to sustain the verdict of the jury and the judgment of the court. (3) The thirty-year Statute of Limitation, sec. 4268, applies. The defendant proved: (a) That neither plaintiffs nor those under whom they claim had ever been in the possession of the land. (b) That neither plaintiffs nor those under whom they claim had paid any taxes on the land since 1869. (c) That after the expiration of the thirty-year period prescribed by the statute, defendant under color of title and claim of ownership entered into the possession of the land and remained in the possession thereof for more than one year. (d) That plaintiffs failed to

bring this action within one year after the termination of the thirty-year period and within one year after the possession of the land by the defendant. (4) The possession of the land by Wood and Stewart, while cutting the timber, was the possession of defendant. Tiedeman on Real Property (2 Ed.), chap. 20, sec. 692, p. 642; Holladay-Klotz L. & L. Co. v. Markham and Duckett, 96 Mo. App. 51. (5) The land was not susceptible of a more strict and definite possession and was so found by the jury. (6) Possession of part of the tract, under color of title, is possession of the whole tract. Sec. 4266, R. S. 1899. (7) A less weight of evidence is necessary to support the claim of title by adverse possession where the entry is with color of title, than where it is not. Draper v. Shoot, 25 Mo. 202. (8) The appellate court, in determining whether the evidence is sufficient to support a verdict, will assume that the evidence is true and will give it every favorable inference which may be reasonably drawn from it. James v. Life Assn.; 148 Mo. 16. (9) It is not enough that there is an insufficiency of evidence; a case will not be reversed on the ground of lack of evidence unless there is no evidence tending to establish the facts found by the jury. Smith v. Royse, 165 Mo. 658; James v. Life Assn., 148 Mo. 16; State v. Fischer, 124 Mo. 462.

GANTT, P. J.—This is an action to determine and quiet the title to the south half of section five in township 30, range 4, west, in Shannon county and containing three hundred and twenty acres.

The suit is brought under section 650, Revised Statutes 1899, and was begun March 29, 1904. At the September term, 1904, of said court, judgment was rendered in favor of the plaintiffs and against the defendant by default, and at the March term, 1905, of said court, said judgment was set aside on petition

for review and the defendant was permitted to file
an answer and make defense.  On November 30, 1905,
the cause was tried in the circuit court of said county
before a jury, and judgment was rendered for the
defendant.  In due form the plaintiffs have appealed
from the judgment and decree.  In his answer the
defendant admitted that he claimed to be the owner
of said land and denied the other allegations in the
petition.  He then set up that he had actual posses-
sion of.the said lands for ten years and then pleaded
the thirty-year Statute of Limitations against the
plaintiffs.  The reply denied all the new matter set
up in the answer.

To sustain the issues upon his part, the plaintiffs
offered in evidence a patent in due form from the
United States to Joshua Spencer dated September
1, 1859, recorded April 13, 1873, in book 1, page 795,
to the lands in controversy.  Plaintiffs next intro-
duced in evidence a warranty deed in due form from
Joshua Spencer and wife to Joseph N. Boyce, dated
August 1, 1860, duly recorded September 3, 1869, in
recorder's office of said county.  Plaintiffs then intro-
duced a warranty deed in due form from Joseph N.
Boyce and wife to Daniel B. Dyer of date September
15, 1869, recorded September 29, 1869, and re-recorded
March 25, 1873.  Plaintiffs then introduced a quit-
claim deed from Daniel Dyer, a single man, to J. W.
Chilton, to an undivided one-half of the said land,
dated March 21, 1904, recorded March 31, 1905.  Plain-
tiffs then rested.

Defendants on their part offered in evidence a
warranty deed in due form from Joshua Spencer to
William E. D. March, dated January 2, 1875, recorded
November 21, 1877, to the introduction of which the
plaintiffs duly excepted at the time for the reason
that the grantor had previously conveyed all his rights,

title and interest in said land to Joseph Boyce by warranty deed. Defendant then introduced a deed from March and wife to Amos Bissel dated May 6, 1876, recorded November 21, 1877, to the introduction of which the plaintiffs interposed the same objection, which being overruled by the court they duly excepted. Defendants then introduced a warranty deed from Bissel to Matheny of date June 1, 1876, recorded November 21, 1877, to the introduction of which plaintiffs objected for the reason that there was no title in the grantor to said deed. Defendants then introduced a warranty deed from Luther T. Matheny to William T. Ingram of date August 18, 1876, and recorded November 21, 1877, to the introduction of which the plaintiffs objected because it was shown that said Matheny never had any title to said land. Defendants then introduced a mortgage by William R. Ingram and wife to Thomas M. Heard of date December 8, 1880, to secure the sum of $1,800, to the introduction of which a like objection was made. Defendants then introduced a release from Heard to William R. Ingram of date July 3, 1882, of the said mortgage debt. Defendants then introduced in evidence a warranty deed from William T. Ingram and wife to the defendant Comanianni of date June 22, 1895, recorded June 25, 1895, to the introduction of which plaintiffs objected for the reason that the said Ingram had no title to said land to convey. Defendants then introduced a sheriff's deed for taxes by George F. Chilton, sheriff, under a judgment in November, 1878, for taxes against Joshua Spencer, D. B. Dyer, William T. Ingram, said deed being dated May 1, 1879, recorded May 21, 1879, conveying the land in question to William T. Ingram, to the introduction of which plaintiffs objected at the time on the ground that the court had no jurisdiction over the person of the defendant Daniel B. Dyer and that no suit had been instituted or prosecuted against said Dyer.

The defendant then introduced in evidence the deposition of William T. Ingram, who testified that he was seventy-five years old and resided in Murphysboro, Illinois. He testified that he had known the defendant Comanianni about fifteen years; that witness had bought the land in suit from Matheny in 1876, and bought the same in at a tax sale in 1879. He testified that he paid taxes on the land in 1877 and from the year 1879 down to the time he sold it to Comanianni, he could not state what amount he paid out in taxes as he had no means of approximation, but supposed it was something like $300, more or less. Asked what acts of ownership he exercised over the land while he owned it, he answered, "Paying taxes and having men to look after the land and timber." That he had never had the land surveyed. He went on the land *once* in 1895; that he had an agent to look after it for him in the person of Mr. Carpenter, a farmer living on the public road running from Eminence to Salem, about two miles from the land. Carpenter consented that a Mr. Wood could build a log house on the land sometime in the eighties; this house was the first improvement ever made on the land to his knowledge. He testified that plaintiff Dyer never occupied the land to his knowledge; that it was wild timber land. There was about one-third of an acre of land across the creek from where the house was built that was susceptible of cultivation, and he gave his consent to the men farming the adjoining land to use this cultivating land. He testified he let it sell for taxes because he could buy it in at a tax sale for less money than to pay the amount of taxes assessed against it, and Dyer had a claim of title by his deed of record. All this evidence was objected to on the ground that it was irrelevant and immaterial and did not tend to prove any issue in the case.

The defendant Comanianni testified that he was forty-nine years old, a coal miner and lived in Mur-

physboro, Illinois; that he bought the land from Ingram in 1895, and paid the taxes, from that day up to the bringing of this suit. That the taxes averaged about nine dollars per year. He was asked what acts of ownership he exercised over the land after he bought it, and testified that he was on the land *twice* and gave orders what to do; had some timber cut on it; he gave Mr. Stewart money to have it surveyed in November, 1902; he was on the land in 1900 and in 1902, the only improvements on the land was a small log house and about one acre cleared. After he bought the land, he allowed Mrs. Woods to occupy the house. He sold Mr. Woods and Stewart all the tie timber on the land. He did not recollect whether they asked permission to stay in the house, but he afterwards learned that. they occupied the house. He had no objection. He supposed that Mrs. Woods went into the house about the time they began to cut the timber.

A. E. McGlashan testified that he had examined the tax records in regard to this land and the assessor's books showed that the land had been assessed to William T. Ingram as far back as 1895, except in the last few years, when it was assessed to the defendant Comanianni, and these taxes appeared to have been paid.

Joseph Woods testified that he lived in Shannon county and knew the defendant. The first and only time he ever saw him was in November, 1901, when he and Stewart entered into a contract with him to cut the timber on this land. They cut it and it took them about two years to do so. They employed ten or fifteen men for the purpose. Witness put his mother in a little house on the place and she lived there about three years. The land is very rough timber land, the bluffs are the highest in the country, not more than an acre or an acre and a half of the land could be cultivated, possibly four or five acres in the whole half section. It was not suitable for pasture

land. It was only valuable for the timber as far as he could judge. He and Stewart simply had a writing to the effect that they had bought the timber, they did nothing but cut the timber off of the land. This agreement between the defendant and Stewart and Woods and others was dated November 13, 1901, and provided: "That the said party of the first part [Comanianni] in consideration of the sum of four hundred dollars does sell and transfer unto the said parties of the second part all railroad tie timber (all timbers too small for railroad ties, also all pine timber, being reserved) on the south half of section five, township thirty, range four west, to be paid for in monthly payments at the amount of four cents per tie for all ties cut from the above described land."

John Lambert testified that he had lived in that county some two or three months and was acquainted with the land and with Dr. Ingram. Hesterly was the first man that he knew of making any improvements on the land and witness bought him out in 1895. He stayed on the land something like a year. He agreed with Ingram to deliver up to him the possession of the land. This witness testified that not more than ten or twelve acres could be cultivated on the whole tract and that only in patches.

F. L. Tyrrell testified he lived near the land in the year 1902. A man could not afford to fence the land for the grass that would grow on it. The creek overflows in the bottom land from hill to hill. The bluffs are very high. The land is only valuable for the timber that is on it.

This was about the substance of all the testimony.

On the part of the plaintiffs the court instructed the jury that the patents and deeds introduced by the plaintiffs in evidence showed the legal title to the premises to be in the plaintiffs, and unless the jury should find by a preponderance of the evidence that defendants have held such adverse possession of said

land under claim of title as the court instructs to be sufficient to divest the plaintiffs of their legal title, the verdict must be for the plaintiffs. The court further instructed the jury that for defendant's possession of the land in controversy under his deeds introduced in evidence to be a bar to plaintiffs' legal title, such possession must have been open, notorious, exclusive, continuous and adverse to plaintiffs, and must have been taken and continued by defendant in person or by tenant by him placed in possession of the land is controversy, or by more than one tenant claiming successively under the owner, the said Comanianni, by a lease. The court refused to instruct the jury at the request of the plaintiffs that their verdict must be for the plaintiffs, and also refused to instruct for the defendant that the tax sale passed all title of the plaintiff Dyer to the defendants' grantor, Ingram, and that under the record evidence the legal title was shown to be in the defendant. The court then gave the jury other instructions which in the main consisted of excerpts from different decisions on the question of adverse possession, but inasmuch as the evidence did not justify any instructions for defendant on that subject, we refrain from inserting them in this opinion. Under the instructions of the court the jury found a verdict for the defendant.

I. The circuit court properly directed the jury that the patent and deeds read in evidence by the plaintiffs showed the legal title to the premises in controversy was in the plaintiffs, and that unless the jury should find by the preponderance of the evidence that defendants had held such adverse possession of the said land under claim of title as would be sufficient to divest the plaintiffs of their legal title, the verdict should be for the plaintiffs. And in order for the defendants' possession of the land to be a bar to plaintiffs' legal title such possession must have been

open, notorious, exclusive, continuous and adverse to plaintiffs, and must have been taken and continued by defendant in person or by a tenant placed by him in possession of the land or by more than one tenant claiming successively under the claimant, the said Comanianni.

The real question confronting us in this case is whether there was sufficient evidence to submit to the jury the question of adverse possession under the ten-year Statute of Limitations, or the thirty-year statute. While ordinarily adverse possession is a matter of fact to be determined by the jury under proper instructions, nevertheless it has often been adjudged by this court that where the evidence was wholly insufficient to establish such a possession as the law requires to divest the title of the true owner, it is the duty of the court to declare as a matter of law that it is insufficient and take the case from the jury. [Brown v. Hartford, 173 Mo. 183.] We are thus necessarily required to examine the nature of the possession upon which the defendants rely to sustain the pleas of the Statute of Limitation, under either the ten or thirty-year statute. The defendant, Comanianni, claims under his grantor, Ingram. There is no pretense whatever that March ˮ or Bissel or Matheny ever had the slightest possession of the land in suit. Ingram testified that he lived in Murphysboro, Illinois; that he bought this land in 1876 from Matheny. He was asked what acts of ownership he exercised over the land while he claimed to own it, and he answered, "Paying taxes and having men to look after the land and the timber." That he visited the land only once in his life and that was in the year 1895. He claims that he had an agent in the person of .Mr. Carpenter, a farmer, who lived about two miles from the land, but Carpenter was not called as a witness to testify to any act that he did on or in relation to the land; in fact the only transaction that it is

claimed Carpenter ever did in regard to the posses-
sion, was in connection with the man Woods. And
Ingram testifies in this indefinite manner in regard to
that:

"Q. Did you yourself directly through Mr. Car-
penter or any other agent contract, agree and consent
that Mr. Wood or some other man to build a house on
said land and to cultivate the tillable land, to-wit, about
one-half acre near the house? Ans. Yes, I think it
was Mr. Wood, through Mr. Carpenter, agent.

"Q. When did you make said contract or lease?
Ans. I do not remember what year, sometime in
the eighties. I *suppose* it was between Mr. Carpenter,
my agent, and Mr. Wood."

But he testifies to nothing definite as to who his
tenant was, nor when, nor for how long a time, or
any other fact which a court or jury could accept as
a basis of an intelligent judgment that he ever had
actual possession of this land so open, notorious and
exclusive that it would advise the real owner of such
possession and adverse claim. He also speaks of per-
mitting a man to farm about one-third of an acre
across the creek from the house, but he does not say
as to this when that was, nor how long, nor in fact
that the man ever actually cultivated this one-third
of an acre. In truth, the payment of taxes on the
land and having an agent look after the land and
timber was all that Ingram ever did. The evidence
that he paid the taxes was of the most unsatisfactory
and inconclusive character as not a single tax receipt
was offered and read in evidence, but conceding that
he did pay the taxes and had an agent to look after
trespassers, it has often been held by this court that
this amounted to no more than evidence of a claim
of ownership and did not constitute actual possession.
This brings us then to the testimony of defendant him-
self.

He stated that he bought this land in 1895, he paid the taxes on the land and was on it twice and gave some orders about what to do and had some timber cut, and left money to have the land surveyed. He was on the land once in 1900 and once in 1902. These are the only acts of ownership by him. The attempt to show that he had a tenant on the premises failed entirely, because the defendant testified that he did not know that Mrs. Woods occupied the little house until after she had left. The contract between the defendant and Woods was simply a sale of the timber on this land by defendant to those parties, and the testimony of Woods shows that he had no lease from the respondent and did nothing on the land save cut the timber. There is not a syllable of testimony that Mrs. Woods was the tenant or lessee of the respondent. On this point, the defendant himself says: "I told Stewart and Woods to cut the timber and sell it, but do not remember just whether they asked to stay in the house or not, but I *afterwards* knew they occupied it. I had no objections." But there is no testimony that Woods and Stewart occupied the house. But in regard to this little building on this land, the testimony of Ingram sought to leave the impression that this house was built by the consent of Ingram or his agent Carpenter, but the defendant called one John Lambert as a witness and he testified that Hesterly was the first man that made the improvement on this land, and that he, Lambert, bought Hesterly out and traded for the improvements in 1890 and lived there a year and then moved off and in 1894 moved back on this land and was living there in 1895, when he was requested by Ingram to vacate the premises, which he says he did about a year later. He testifies positively that he never had any lease from Ingram and was not his tenant. Now there was but one house on the land and this was the house put up by Hesterly and it must needs follow that any claim by Ingram

that he had possession of this land through a tenant occupying this house prior to 1896 is utterly without foundation, as Lambert was not the lessee of Ingram and was holding adversely to him up to that date. This action was brought in 1904, and even if the defendant had held continuous possession of the land from the date to his purchase from Ingram in 1895 he could not have had ten years' possession and hence while the court's instruction correctly states the law in this case, it was absolutely without substantial evidence upon which to base it. The only possession which the defendant himself claims to have had was the cutting of this timber in 1902 and this was not done by the defendant or for him, but the parties to whom he had sold the timber. As already said the possession by Mrs. Woods was without any authority of the defendant and there is nothing to show that she was his tenant or lessee. The most that can be said of the defendant's testimony on this point is that when he heard of Mrs. Wood's occupancy, he made no objection. In Brown v. Hartford, 173 Mo. l. c. 194, the court, in speaking on the subject of what constitutes possession to ripen into title, says: ''Acts of ownership by others than the holder of the legal title should not be held sufficient to constitute adverse possession unless they were of such frequency and of such a character as would at all times apprise the real owner that his seizin was interrupted and that his title was endangered. Most dangerous results would flow from the permission by courts of titles by limitation to ripen, in favor of those holding mere color of title, without actual occupancy, by acts of ownership so slight in themselves as not calculated to attract the attention of the real owner, or to indicate that his seizin (that follows his legal title) was interrupted. An occasional trespass by way of cutting timbers or digging a few loads of rock, is not sufficient to amount to an adverse assertion of title against the true owner,

in the absence of express notice to the owner of such assertion of ownership by the trespasser." In Pharis v. Jones, 122 Mo. l. c. 131, it was said: "The payment of taxes on land by plaintiff, cutting timber therefrom, and keeping off trespassers, did not constitute possession, but 'were merly acts of ownership, tending to show that he claimed to own it." [See Nye v. Alfter, 127 Mo. 529.]

As to the plea of thirty years limitation (Sec. 4268, R. S. 1899), the same infirmity inheres in the case as has been noted in regard to the ten years' limitation, to-wit, any actual possession of the land by the defendant Comanianni. His complacent failure to object to the occupation of the little cabin by Mrs. Woods, when he was ignorant of her occupying the house, falls far short of establishing a tenancy and an actual occupancy by him through her as his tenant, and his payment of taxes and selling the timber to the tie choppers did not constitute actual possession. Counsel refer us to Holladay-Klotz L. & L. Co. v. Markham, 96 Mo. App. 56, to establish that the cutting of timber was evidence of adverse possession, but the language of Judge Bond properly distinguishes the effect to be given such testimony, when he says of the "instruction wherein the court told the jury that 'actual possession of the land with claim and exercise of rights of ownership, would entitle defendants to a verdict,' we do not see how the jury could have been misled if they were capable (and we must assume they were) of distinguishing *between mere entry to cut and remove timber,* and facts tending to show actual possession with claim and exercise of rights of ownership." Obviously the learned judge did not regard the mere cutting and removing timber, disconnected with any other evidence of visible actual occupancy, sufficient to constitute adverse possession.

In our opinion the defendant has no actual possession and there was no substantial evidence to sub-

mit that question to the jury. A careful reading of every line of this record impresses us that this was a bold attempt to deprive the owner Dyer of his land by taking deeds with full knowledge of his recorded title and then cutting and removing the timber by trespassing on his land. The defendants' claim has no element of merit, honesty or fairness in it and the owner of timber lands in this State cannot be deprived of their property in this manner.

The judgment of the circuit court is reversed with directions to enter a decree divesting defendants of all title to said lands and quieting the same in plaintiffs.

*Burgess* and *Fox, JJ.*, concur.