# HENRY F. ACKERMAN et ux. v. ALICE RYDER, Appellant.

### Division One, April 13, 1925.

1. **AGREED BOUNDARY LINE:** Fence for Convenience. Where the owner of a ten-acre lot had given his son the south half, a fence built by the father a few feet north of the middle line, for the purpose of preventing the son's cows from transgressing upon his corn field on the north half, and therefore built as a matter of convenience, cannot be held to be an agreed boundary line between the two halves.

2. ————: **Division Fence: Claiming Only to True Line.** When two adjoining tracts are divided by a fence which the owners suppose is the true line, but each claims only to the true line, neither is bound by the supposed line, but both must conform to the true line when it is ascertained; and possession by one of the land of the other inclosed by the fence, without intending to claim beyond the true line when ascertained, will not work a disseizin in his favor, nor is possession sufficient to show an agreement upon the supposed line as an agreed dividing line.

3. **ADVERSE POSSESSION:** Matter of Law. Continuous possession for twelve years of a strip of land inclosed by a fence to which the adjoining owner had title does not alone give title to the possessor or his grantee; if he claimed to own all the land within the fence, but also testifies that he claimed to own only what his deeds showed that he owned and did not intend to claim beyond the true line, it cannot be said as a matter of law that his possession of the disputed strip so inclosed was held under claim of title thereto or by acts tantamount to a claim of title.

4. ————: **Ten Years: By Party and Grantor: Friendly Possession beyond True Line: No Claim of Ownership.** Where ejectment was brought in 1921 for the narrow strip of land in controversy, against a defendant who had bought the adjoining tract and gone into possession in 1919, she did not establish title to the disputed strip by showing that she and her grantor, who bought and went into possession in 1912, had been in continuous adverse possession of the strip since 1912. To establish title by adverse possession she must have gone further back, and shown that her grantor's predecessor had been in adverse possession long enough that his possession, when coupled with that of her own and that of her grantor, constituted a continuous adverse possession for ten years; and she did not show that the possession of her grantor's predecessor was

adverse, if the fence which inclosed the disputed strip was built, by the owner of the adjoining tract, of which the strip is a part, upon his own land, as a matter of convenience, to keep said predecessor's cattle off of his corn field, and with no intention on the part of said adjoining owner to give the strip to said predecessor or on the part of either to agree upon the fence as the dividing line between the tracts. In such case it was necessary for her to show that such predecessor of her grantor claimed to own the disputed strip and claimed to own up to the fence as the true line against the world without condition or subsequent ascertainment, and that his grantee and she herself did the same. And where there was no evidence of a claim of continuous ownership for ten consecutive years, the question of defendant's claim of title by adverse possession should not have been submitted to the jury.

5. MEASUREMENT OF LOT: Equal Division: Exclusion of Adjoining Street. Where the recorded plat shows that the north-and-south distance of a lot, bordered on the north by a fifty-foot street, dedicated thereby to public use, is 659 feet from the center of the street to the south line of the lot, and that the south half of the street is 25 feet wide, the north-and-south width of the lot is found by subtracting 25 from 659, and the remainder (634 feet) is the width of the lot, and the south boundary of the north half of the lot is a line 317 feet south of the south line of the street; and a strip of land, thirteen feet wide at one end and seventeen at the other, along the south side of the north half and included within the measurements of the north half as thus ascertained, is conveyed by deeds conveying the north half, although said strip is included within fences inclosing the south half.

Citations to Headnotes: Headnote 1: Boundaries, 9 C. J., sec. 193. Headnote 2: Adverse Possession, 2 C. J. sec. 243; Boundaries, 9 C. J. secs. 174, 199. Headnote 3: Adverse Possession, 2 C. J. secs. 214, 242. Headnote 4: Adverse Possession, 2 C. J. secs. 585, 621, 622, 626. Headnote 5: Boundaries, 9 C. J. sec. 95.

Appeal from Jackson Circuit Court.—*Hon. Thad B. Landon,* Judge.

AFFIRMED.

*Haff, Meservey, Michaels, Blackmar & Newkirk* for appellant.

The court erred in sustaining plaintiffs' motion for a new trial. (1) Because there was substantial evi-

dence that the fence on the north of the land in the possession of the defendant had been established as an agreed boundary and defendant was entitled to have that question submitted to the jury.  (a)  Plaintiffs, by requesting the peremptory instruction at the close of all the evidence admitted as true all facts the entire evidence in the case tended to prove in support of defendant's case and all reasonable deductions which might be drawn therefrom in favor of defendant.  Fry v. Ry. Co., 200 Mo. 377; Stauffer v. Met. St. Ry. Co., 243 Mo. 305; Burton v. Holman, 288 Mo. 70; Knoche v. Pratt, 194 Mo. App. 300; Felix v. Bevington, 52 Mo. App. 403; Johnson v. Grayson, 230 Mo. 380; Von Treba v. Laclede Gaslight Co., 209 Mo. 648; Strauchon v. Met. St. Ry. Co., 232 Mo. 587; Baldwin v. Springfield, 141 Mo. 205; Dyer v. Cowden, 168 Mo. App. 649.  (b)  There was substantial evidence that the fence had been agreed upon as the boundary line.  Lindell v. McLaughlin, 30 Mo. 28; Martin v. Hays, 228 S. W. 741; Jacobs v. Moseley, 91 Mo. 457; Turner v. Baker, 64 Mo. 218; Atchison v. Pease, 96 Mo. 556; Goltermann v. Schiermeyer, 111 Mo. 405; Brummell v. Harris, 148 Mo. 430; Schwartzer v. Gebhardt, 157 Mo. 99; Lemmons v. McKinney, 162 Mo. 525.  (2) The evidence showed the defendant and those under whom she claimed had been in adverse possession of all the land south of the fence for more than ten years, and defendant was entitled to have that question submitted to the jury.  Draper v. Shoot, 25 Mo. 197; Reader v. Williams, 216 S. W. 738; Wilkerson v. Eilers, 114 Mo. 245; James v. Indiana Railroad, 91 Ill. 554; Barnes v. Light, 116 N. Y. 34; Dunlap v. Griffith, 146 Mo. 283; Burgert v. Borchert, 59 Mo. 80; Hedges v. Pollard, 149 Mo. 216; Milligan v. Fritts, 226 Mo. 189; Gloyd v. Franck, 248 Mo. 468; Diers v. Peterson, 290 Mo. 249; Webb v. Thiele, 77 N. W. 56.

*Staubenrauch & Hartz* for respondents.

(1)  There was absolutely no evidence showing any agreed line established as a dividing line at any time

by the elder Putnam and his son, Ralph, with respect to the north and south halves of Lot G. In order for the owners of contiguous lots to establish a certain line different from the true line as the dividing line between their respective properties, there must be either a dispute as to the true division line between them, or this line must be uncertain, and the parties therefore in ignorance of the true line must have agreed upon a certain line as the boundary line between the respective tracts and such line so established must have been thereafter recognized by both of them as the line separating their respective properties, and both of them must have claimed the title up to the established line a sufficient length of time to show that both recognized it as their dividing line. Turner v. Baker, 64 Mo. 218; Jacobs v. Moseley, 91 Mo. 457; Lemmons v. McKinney, 162 Mo. 525; Foard v. McAnnelly, 215 Mo. 371; Ware v. Cheek, 201 S. W. 847. (2) Possession alone for more than ten years is not sufficient; such possession must be held under a claim to the title; that possession no matter for what length of time, unless accompanied by a claim to the title or at least by acts tantamount to a claim to the title, can never ripen into title by adverse possession. Ware v. Cheek, 201 S. W. 849; Benne v. Miller, 149 Mo. 228; Goltermann v. Schiermeyer, 125 Mo. 291; Stevenson v. Black, 168 Mo. 549. The record is entirely silent in this case on any claim to the title of the tract of ground in controversy until the defendant herself bought this property in April, 1919, and took possession. (3) The survey offered by plaintiffs properly divided the north and south halves of Lot G, by drawing a line within the net dimensions of this lot. The streets were in the plat dedicated to the public use and have always been used as streets and thoroughfares and the trial court was correct in holding that a correct survey of either half of lot G would be made by dividing the net dimensions of the lot, and not including in either half any part lying in 77th Street on the north or Holmes Street on the west. 2 Devlin on Real Estate (2 Ed.) p. 1953; Burbach v. Schweinler, 52 Wis. 386.

SEDDON, C.—Suit to recover possession of a strip of land in Lot G, in Garden Place, a subdivision of land in Jackson County, Missouri. Plaintiff's petition is cast in two counts, the first count being in ejectment to recover possession of the strip of land with damages and rental for its detention, and the second count being an action to determine and ascertain the title to same in plaintiffs. .

The defendant's answer is a general denial, together with an allegation that she is the owner of the strip of land in controversy and an allegation that title thereto had vested in her and those under whom she claims by adverse possession. The reply is a general denial.

The suit was begun on July 6, 1921. The land in controversy is a strip twenty feet wide at the west line of Lot G in Garden Place, abutting on the east line of Holmes Street, and narrowing to thirteen feet wide at the east line of said Lot G, and lies between, or adjacent to a line dividing, the north one-half and the south one-half of said Lot G, as said lot is marked and designated on the recorded plat of Garden Place. The common source of title is Nathan W. Putnam, who acquired title to "all of Lot lettered G of Garden Place, a subdivision, as the said Lot G is lettered and designated upon the recorded plat of said subdivision, filed in the office of Recorder of Deeds in and for Jackson County, Missouri, containing ten acres," by warranty deed dated and recorded on November 18, 1889.

Nathan W. Putnam and wife, by warranty deed dated December 20, 1906, and recorded on April 1, 1907, conveyed to their son, Ralph W. Putnam, "all of the south one-half of Lot G, in Garden Place, a subdivision, as the same is marked and designated on the recorded plat thereof."

Ralph W. Putnam and wife, by warranty deed dated June 21, 1912, and recorded on June 25, 1912, conveyed the last described land by the same identical description to Charles A. Russell.

Charles A. Russell and wife, by warranty deed dated March 22, 1919, and recorded on April 7, 1919, conveyed

to defendant (appellant here), Alice D. Ryder, "the south one-half of Lot G, in Garden Place, a subdivision in Jackson County, Missouri, as the same is marked and designated on the recorded plat in the office of the Recorder of Deeds, in Jackson County, Missouri."

Nathan W. Putnam died testate, and by his will, probated on April 24, 1919, devised the real property owned by him at his death to his four children, including Ralph W. Putnam. These four children, or their heirs, by warranty deed dated February 12, 1921, and recorded on February 26, 1921, conveyed to plaintiffs (respondents here), Henry F. Ackerman, and Kate Ackerman, husband and wife, "all of the north one-half of Lot G, Garden Place, in Kansas City, Missouri."

The original plat of Garden Place, recorded on March 12, 1889, was put in evidence by plaintiffs, and shows Howard Avenue, now called 77th Street, fifty feet wide, adjoining Lot G on the north, and Holmes Street, sixty feet wide, adjoining said Lot G on the west. The plat shows the distance from the south line of Lot G to the center line of Howard Avenue, now 77th Street, measured along the center line of Holmes Street, to be 659.35 feet, and the distance, measured along the east line of said lot, to be 658.98 feet. The distance from the east line of the lot to the center line of Holmes Street, measured along the center line of Howard Avenue, now 77th Street, is shown to be 659.05 feet, and, measured along the south line of the lot, is shown to be 659.01 feet. The recorded plat recites on its face: "The streets and avenues as represented on this plat are hereby dedicated to public use forever." Deducting twenty-five feet, or one-half the width of Howard Avenue, now 77th Street, as shown on the plat, from 659.35 feet, the distance or measurement of the west line of said Lot G, as shown on the plat, is 634.35 feet, and one-half that distance is 317.17 feet. Applying the same method to the east line of Lot G, the distance or measurement of the east line of said lot, as shown on the plat, is 633.98 feet and one-half that distance is 316.99 feet. These distances, as shown by

the recorded plat of Garden Place, accord with a survey, made for plaintiffs on March 17, 1921, in evidence, which shows the true dividing line between the north and south halves of said Lot G to be a line drawn across the lot from a point in the west line of said lot, equidistant 317.17 feet from both the north and south lines of said lot, to a point in the east line of said lot, equidistant 316.99 feet from both the north and south lines of said lot. The survey shows the location of a fence on the north one-half of said lot, beginning at a point in the west line of said lot twenty feet north of the equidistant or bisecting line of the lot, and extending easterly across the lot to a point in the east line of said lot thirteen feet north of said equidistant or bisecting line. The strip of land lying between this fence and the bisecting line of the lot is the land in controversy. The evidence shows there is an old apple orchard, located largely on the north part of the south half of the lot, which was set out in 1894. A few of the apple trees stand north of the bisecting line and north of the fence.

As to the time and the purpose of the building of the fence, Mrs. Ralph W. Putnam, the daughter-in-law of Nathan W. Putnam, testified as a witness for plaintiffs: "There was no fence between the two parts at all when we moved out there. Father Putnam had been cultivating it all in corn between our apple trees and also his north part. We moved out there in the late fall or winter of 1895, and the following spring he wanted to put corn in there and he run this fence simply to keep our stock off of his ground.

"Q. Was there anything said by old Mr. Putnam when he put that fence in? A. Yes. There was this much said about it: When father put this fence through there, it took off one row of what we called our apple trees. When we moved out there, he gave us our choice of the two tracts of ground. We took the apple orchard, because we liked that better, and we thought he had stolen one of our apple trees. He said, 'No, by rights I am entitled to almost another row.' And that was all that was said about it.

"Q. Now then, at the back, Mrs. Putnam, did this fence swerve either north or south? A. No, at that time it did not.

"Q. Did it later? A. Yes; because we lived there more than four years before father Putnam built on his half, but dug a well there. And then father built and moved out there himself, and then moved that south— or east end of the fence in toward our well in order to get access to the well to carry water from there."

On cross-examination, the witness testified:

"Q. Do you know what year the fence running through, all the way through this property, was built? A. Yes, sir; it was built the spring or summer of 1896.

"Q. That was before Mr. Nathan Putnam executed and delivered to Ralph Putnam a deed? A. Yes, before —we lived there ten years before he got the deed to the place.

"Q. And the fence was there when he gave you the deed? A. Yes, sir."

Witness also testified that she went out and saw where the present fence line is, and she was then asked:

"Q. Where was the fence that was there when you lived there along the north side of your tract with reference to the fence that is there now? A. It is very much further south than this fence.

"Q. About how much further south? A. Well, I should judge over fifteen, between fifteen and twenty feet."

Plaintiff, Henry Ackerman, testified on cross-examination:

"Q. When you bought this north part, did you go out there and look at it before you bought it? A. Yes, sir.

"Q. You saw this fence there on the south of this tract which you own now? A. Yes, sir.

"Q. Did the agent for the Putnam estate take you out there and show you this property? A. Yes, sir.

"Q. And he showed you the fence lines, didn't he? A. He didn't say whether that was the line or not.

"Q. Well, you saw the fences? A. Yes, sir.

"Q. And he said, 'This is the property I am offering to sell you?' A. Yes, sir.

"Q. And you afterwards completed the purchase of the north half of this lot? A. Yes, sir.

"Q. You had this survey made after the deed was delivered to you, and after you had completed the purchase? A. Yes, sir.

"Q. After you had bought this land, then you had it surveyed? A. Yes, sir.

"Q. And it was then for the first time you claimed or had found that you might claim any land south of the fence? A. Yes, sir."

Plaintiffs put in evidence tax receipts showing payment of taxes assessed against the north half of Lot G for the years 1915 to 1921, inclusive, by plaintiffs and their grantors.

The defendant introduced evidence tending to prove that the fence has stood on its present location for fifteen years or longer.

There was also some testimony to the effect that there had been at one time another fence, north of the fence in controversy, the two fences forming a lane along which stock was driven around the garden on father Putnam's tract to be watered from a well on the rear or east side of Ralph Putnam's tract. This well, according to the record, was located from twenty-five to eighty feet south of the fence in controversy, and water was carried from the well to the fence to the stock on father Putnam's place.

Charles A. Russell, the grantee of Ralph W. Putnam, testified for defendant:

"Q. Did anyone show this property to you at the time you bought it? A. Mr. Warden showed it to me.

"Q. And was the property fenced then? A. Yes, sir.

"Q. Was there a fence on the north and east and south and west? A. Yes, sir.

"Q. And did he point out to you these fences as the boundaries? A. It is a long while ago to say exactly what was said on that line.

"Q. He showed you this? A. Yes, he showed the place. It is such a long while ago I forgot what he said exactly.

"Q. Did you make any changes in the fences while you were there, I mean location of the fences? A. I did not.

"Q. Is the fence as it is there now the same as it was in 1914? A. I couldn't say.

"Q. Now then, when you went out there nothing was said about where the lines were of the tract you were buying? A. When I bought it?

"Q. Yes. A. I don't remember, it is so long ago, what was said.

"Q. Now then you took Mrs. Ryder out there to buy the place which you sold to her, didn't you? A. I showed them the place, yes.

"Q. And you didn't say anything to her about where the lines were of the tract, did you? A. Why, I can't exactly remember. I took her on the place and showed them the place like I had a number of other people.

"Q. You told her you were selling her the south half of Lot G, Garden Place, didn't you? A. Yes, I suppose I did.

"Q. And you didn't point out to her any lines of her tract, did you? A. I always mentioned that my place, as I understood, was the south fence on and that if I—when I sold it, I would have it surveyed so as to know what they were getting.

"Q. And you did have it surveyed, didn't you? A. Yes, sir.

"Q. And did you hand her that survey? A. I handed it to Mr. Ryder, I think.

"Q. You handed it to Mr. Ryder? Now still you haven't answered my question. You didn't tell Mrs. Ryder as to where any lines were of this lot when you

sold it to her? A. I don't remember; that has been so long ago. I don't remember any conversation about the fence.

"Q. Mr. Russell, when you bought the property you didn't have a survey did you? A. No, I did not.

"Q. And you bought the property between the fence lines? A. I don't know about that. I bought it and left a good deal to my lawyer.

"Q. You wouldn't tell the jury, though, anything was said about fences at the time you bought the place? A. Why, I was under the impression that I was buying the (land) enclosed by the fences; was out there once or twice, with Mr. Warden, and he probably—

"Q. (Interrupting) But nothing was said about fences at the time? A. Now it is hard to bring every-thing of that kind up after twelve years exactly. Just exactly what was said. I know I was under the impres-sion I was buying what was between the fences, north, south, east and west.

"Q. In other words, you went out and saw the fences there? A. Yes.

"Q. And then, of course, you thought you were buying that ground? A. Yes, sir.

Q. I believe you said that when you bought the place, it wasn't surveyed? A. No.

"Q. And you didn't know where the true lines were of the lot? A. Well, only what the abstract showed. I left that to my lawyer.

"Q. And your reason for surveying it was you didn't want to deed to Mrs. Ryder any more land than what you had? A. I did not.

"Q. And you wanted to know that the land you were giving her possession of was the land that was cov-ered by your deed? A. Yes, sir. I wanted to sell her what I had, no more, no less.

"Q. Yes; whatever you had title to and you had title to the south half of Lot G? A. I think that is the way my deed reads.

"Q. Yes; and what you wanted to deed her was whatever land was in the south half of Lot G? A. Whatever land I purchased there.

"Q. Whatever land you had title to? A. Whatever land I had a right to sell.

"Q. Now, Mr. Russell, you never claimed any more land out there than what the record called for, did you? A. The question never came up.

"Q. You never made any claim to any more land than what your deed called for? A. That question never—

"Q. (Interrupting) I know, but you never did? A. No, sir; I never did.

"Q. You never made any claim and you never paid taxes on anything but the south half of Lot G? A. Nothing I know of.

"Q. You just paid taxes on the south half of Lot G? A. That is what I supposed I paid.

"Q. Now then you always believed out there your fences were on the right line, didn't you, until you surveyed it? A. I always believed the fences were on the line.

"Q. In other words, no question was raised about it until you surveyed it? A. No, no one ever objected to the line.

"Q. That was never talked about while you owned the place, by anybody? A. Well, I heard that it might be—they didn't say the fences was, but the place might be a little short of five acres.

"Q. You heard that rumored? A. Yes, sir.

"Q. Now you never intended to claim, as I understand, any more number of feet out there than what correct survey would show to be in the south half of Lot G? A. No, I didn't claim anything I didn't have.

"Q. State to the jury while you were in possession of this property if any claim was ever made by anybody to you claiming part of this property? A. No, sir.

"Q. What you did claim was the land enclosed in the fence? A. What I claimed was what the abstract and survey showed.

"Q.  And the land you bought?  A.  Yes, I only claimed what the abstract and survey would show.  I supposed it to be the land I bought.

"Q.  There never was any question when you owned it about the location of the north line?  A.  No, sir."

The defendant, Alice Ryder, testified that she purchased her property from Mr. Russell and moved thereon on April 5, 1919, the day it was purchased.  The property at that time was entirely surrounded by fence.  Defendant had been living on the property since that time.  Inquiry was made of her respecting what property she claims, to which she answered:  "I am claiming from fence line to fence line, from the west fence to the east fence; from the south fence to the north fence as it was when I went in there and as it still is.  The old fence, the part of it, is still standing on the north side.  All other fences are the old fences.  Nothing has been changed about them."  Witness denied she was furnished with a survey of the property at the time she purchased from Russell, but had a survey made herself about six months before the trial.  She testified she went out to the property twice before buying, but did not go out with Mr. Russell and Mr. Russell did not show her the place.

Testimony was adduced that there are improvements, consisting of houses, barns, and chicken houses on both tracts, but these improvements are not located upon, or immediately adjacent to, the strip of land in controversy.

Defendant offered a surveyor as a witness, who testified that it is the practice of surveyors, in surveying properties of the kind here in question, to run or make the measurements from the center of the streets.  Defendant's son testified that he saw the surveyor running the line for the plaintiffs and that plaintiffs' surveyor "stated that he was surveying this property according to instructions from the attorneys, but that it was being surveyed incorrectly so far as he had ever surveyed before.  He stated that always before he had surveyed property from the center of the street line and that this

time according—because he was instructed to by the attorneys, he was surveying from the side of the street, a difference of, I don't know how many feet exactly.'' At the time the recorded plat of Garden Place was filed for record, no part of the land was within the corporate limits of any city.

In rebuttal, J. F. Campbell testified for plaintiffs that, in 1909, he had signed a contract to purchase the south half of Lot G from Ralph Putnam and had then had the tract surveyed. That survey showed the north line of the south half of Lot G to be 329.67 feet north of the south line of said lot and the fence in controversy was found by the witness to be some twelve or thirteen feet south of the north line of the tract, as shown by the survey. "Q. Just state, Mr. Campbell, what distance this north fence of the south half was from the south line of the south half of Lot G? A. It was about twelve or thirteen feet short of 330 feet; 12½ feet short of 330 feet. Q. That would be about 317 feet? A. Yes."

Plaintiff, Henry Ackerman, testified in rebuttal:

"Q. At the time you had the survey made out there, did you take it up with Mrs. Ryder in reference to having the fence placed on the proper line? A. Yes.

"Q. What did she say about it? A. She said that she knew that the fence wasn't on the line, but she said there wasn't that much difference in it.

"Q. Not as much difference as your survey? A. Yes.

"Q. She said she knew that the fence wasn't on the proper line? A. Yes, sir.

"Q. Well, was there anything more said? A. Then I talked to her and told her to have a survey made of it and see who was wrong and she kept putting me off, from time to time, and then she told me to see Mr. Ryder.

"Q. Did you talk to Mr. Ryder then in response to her request? A. Yes, sir.

"Q. What did Mr. Ryder say? A. Why, I talked to Mr. Ryder and he told me the same thing, he knew the fence wasn't on the line.

"Q. But he claimed there wasn't as much difference as your survey showed? A. Yes, sir."

Plaintiffs requested the court *nisi*, at the close of defendant's evidence and again at the close of all the evidence, to give a peremptory instruction to find the issues on both counts of the petition in their favor, which instruction was refused. The case was thereupon submitted to the jury upon several instructions given at request of plaintiffs and defendant, respectively, and the jury returned a verdict for defendant on both counts of plaintiffs' petition. Plaintiffs, in due time, filed their separate motions for a new trial and in arrest of judgment. Thereafter, plaintiffs' motions were severally submitted to the trial court and by the court sustained, "because of the error of the court in refusing peremptory instruction requested by plaintiffs at the close of plaintiffs' (defendant's?) case and also plaintiffs' peremptory instruction at the close of all the testimony." From the order granting a new trial and in arrest of judgment, defendant has appealed to this court. Appellant claims the trial court erred in sustaining plaintiffs' motions for a new trial and in arrest of judgment, (1) because there was substantial evidence that the fence on the north of the land in possession of defendant had been established as an agreed boundary and defendant was entitled to have that question submitted to the jury, and (2) because the evidence shows the defendant, and those under whom she claims, had been in adverse possession of all the land south of the fence for more than ten years, and defendant was entitled to have that question submitted to the jury.

I. Appellant contends that there was substantial evidence that the fence in controversy had been agreed upon, by the owners of the adjoining tracts of land, as the boundary line between their respective tracts. Furthermore, that this issue was properly submitted to the jury, which, by its verdict, found the issue in favor of appellant. The evidence tends to show that the fence was erected in the spring of

Agreed
Boundary.

1896. At that time the father, Nathan W. Putnam, was in possession of the north half of Lot G, Garden Place, and his son, Ralph W. Putnam, was in possession of the south half of said lot, under a parol gift from his father. The only testimony touching the erection of the fence is that of Mrs. Ralph Putnam, the son's widow. She testified: "Father Putnam had been cultivating it all in corn between our apple trees and also his north part. We moved out there in the late fall or winter of 1895, and the following spring he wanted to put corn in there and *he run this fence simply to keep our stock off of his ground.* There was this much said about it: When father put this fence through there, it took off one row of what we called our apple trees. When we moved out there, he gave us our choice of the two tracts of ground. We took the apple orchard because, we liked that better, and we thought he had stolen one of our apple trees. He said, 'No, by rights I am entitled to almost another row.' *And that was all that was said about it.*" Mrs. Putnam also testified that the fence erected by the elder Putnam was located between fifteen and twenty feet south of the present fence. In the latter testimony, she is corroborated to some extent, at least, by the witness, J. F. Campbell, who testified that in 1909 the fence was some twelve or fourteen feet south of the surveyors' markers, denoting the line surveyed by them as the true dividing line between the north and south halves of the lot. We think that the evidence falls far short of tending to establish the fact that the fence erected by the elder Putnam was agreed upon by father and son as the dividing line between their respective tracts. Neither does the evidence tend to show that there was, at any time, any controversy or dispute between father and son, respecting the true dividing line between their properties. At most, the evidence rather shows the fence was erected for the purpose of convenience only, i. e., simply to keep the son's stock out of the father's growing corn. Again, there is some conflict in the testimony as to whether the fence, as originally erected by father Putnam, continued

to stand upon its then location, or whether the original fence was fifteen or twenty feet south of the present fence.

In Schad v. Sharp, 95 Mo. 1. c. 578, we said: " 'It is the well-settled law in this State that when two adjoining proprietors are divided by a fence which they suppose to be the true line, each claiming only to the true line, they are not bound by the supposed line, but must conform to the true line when ascertained.' [Jacobs v. Mosely, 91 Mo. 457; Tamm v. Kellogg, 49 Mo. 118; Thomas v. Babb, 45 Mo. 384.] Their possession under mistake or ignorance of the true line dividing their premises, and without intending to claim beyond the true line when discovered, will not work a disseisin in favor of either party. [Houx v. Batten, 68 Mo. 84; St. Louis University v. McCune, 28 Mo. 481.]"

The foregoing language was quoted with approval by GRAVES, J., in the more recent case of Foard v. McAnnelly, 215 Mo. 371. In the last cited case, we said: "As we take it there is a vast difference between an agreement as to what shall be the division line, and a mere supposed division line which has been acted upon by the parties, with no intention of claiming further than the true line. . . . Under the law mere possession is not sufficient to show the agreement. The agreement itself must be made to appear."

The record title to the disputed land is in respondents, as we will show in a subsequent paragraph of this opinion, and the burden was, therefore, cast upon appellant to prove either that the fence was agreed upon by the respective owners of the adjoining lands as the boundary line, or that she and her grantors have held adverse possession of the disputed land for ten years, as charged in her answer. If appellant failed in this proof, then the trial court should have directed a verdict for respondents on those issues, and so it has not erred in granting them a new trial of those issues for the reason it stated. [Chilton v. Comanianni, 221 Mo 685.]

II.   Appellant claims that the evidence shows that she and those under whom she claims have been in adverse possession of all the land south of the fence for more than the statutory period of ten years, and that she was entitled to have the issue of adverse possession submitted to the jury.

Adverse
Possession.

Respondents' action was begun on July 6, 1921.  Appellant took possession of the south half of Lot G, according to her testimony, on April 5, 1919, the date of delivery of the deed from Charles A. Russell, slightly more than two years prior to the commencement of the instant suit.  So it is instantly apparent that appellant's claim of ownership by reason of adverse possession for the statutory period of ten years depends upon her proof of the continuous adverse possession of those under whom she claims title.  Charles A. Russell, her immediate grantor, acquired title to the land by deed from Ralph W. Putnam in June, 1912.  Appellant offered Charles A. Russell as a witness in her behalf for the purpose of proving his adverse possession of the strip of land in controversy.  He testified that, when he bought the property, it was shown to him by Mr. Warden, acting for Ralph Putnam, and that the property was fenced on the north.  When asked if Warden pointed out the fence as the boundary, he replied: "It is a long while ago to say exactly what was said on that line.  It is such a long while ago I forget what he said exactly.  It is hard to bring everything of that kind up after twelve years exactly.  Just exactly what was said.  I know I was under the impression I was buying what was between the fences, north, south, east and west."  When asked if the fence is in the same location as in 1914, witness stated, "I couldn't say."  After stating that he had shown the land to Mrs. Ryder, the appellant, he was asked if he had told appellant where the lines were, and answered: "Why, I can't exactly remember.  I took her on the place and showed them the place like I had a number of other people.  I always mentioned that my place, as I understood, was the south fence on and that

if I—when I sold it, I would have it surveyed so as to know what they were getting." (The appellant, herself, testified that Russell had not shown her the land). Witness did have the land surveyed "to be accurate about it." Witness was asked if he had "bought the property between the fence lines," to which he replied, "I don't know about that. I bought it and left a good deal to my lawyer. Only what the abstract showed. I left that to my lawyer." Witness had the land surveyed because he didn't want to deed to appellant any more land than he had. "I wanted to sell her what I had, no more, no less. Whatever land I had a right to sell." Asked if he claimed any more land than the record called for, he stated that "the question never came up. I always believed the fences were on the line. No one ever objected to the line. I didn't claim anything I didn't have. I only claimed what the abstract and survey would show. I supposed it to be the land I bought." While it may be taken as undisputed that Russell had continuous possession of all the land south of the fence from June, 1912, up to April 5, 1919, when he delivered possession to appellant, nevertheless, giving to his testimony the fullest import, it cannot be said, as a matter of law, that his possession of the strip of land in controversy was held under claim of title thereto, or by acts tantamount to a claim of title.

But even if we are wrong in this conclusion, still appellant has not proved continuous adverse possession for ten years before the commencement of the instant suit. It devolved upon her to prove that the possession of Ralph W. Putnam was adverse to his father under claim of title, or by acts tantamount to claim of title. The record before us is lacking in that proof. As before stated, the proof shows the fence was erected by the elder Putnam for the purpose only of convenience in keeping the son's stock off the father's corn. There is no proof of any real dispute between father and son respecting the true boundary line between their respective tracts, or that either of them claimed the fence to be the true boundary, or that they were mistaken as to

the true boundary. In view of this situation, and also in view of the fact that both halves of the lot were then owned by, and in possession of, members of the same family, we cannot consider the mere acquiescence of father and son in the location of the fence, erected, as the evidence indicates it was, for mere convenience of the parties and not as a boundary line, as an act tantamount to a claim of title to the land lying between the fence and the true boundary line. Neither do we deem such acquiescence to be sufficient evidence of an agreement between father and son that the fence should be the true dividing line between their properties.

The rule is stated in Brummell v. Harris, 148 Mo. l. c. 442, thus: ''When a party relies on the Statute of Limitations to fix his boundary line he need not show an agreement, but he must show that he has held possession up to the line for the period prescribed by the statute; that he has claimed it as his line against the world without condition as to subsequent developments. If the circumstances show that he claimed the line believing it to be the true boundary, but subject to correction as the fact might afterwards develop, then no matter how long he thus held it he would acquire no title beyond his true line. But if he claimed it against all comers to be the true line, and held it for the period prescribed by the statute, it became his against the world. And if the adjacent property owners each occupied up to a line both believing it to be the true line, but neither so maintaining it against what might thereafter be discovered to be the true line, the possession of neither is adverse to the other.''

In Ware v. Cheek, 201 S. W. 847, this court said: ''For the plaintiff the record shows: (1) A good paper title of outlot 42 in the plaintiff; and (2) that the strip of ground in dispute is and was part of such outlot 42. These facts the court was practically forced to find under the record. With these findings for the plaintiff, the pleadings left but one open door for an escape by the defendant, i. e., adverse possession for ten or more years. Does the evidence show such adverse possession? We

think not. The most that the evidence shows is that for twenty-five years there had been a fence just where the fence is now, and that this disputed ground is on defendant's side of the fence. This does not suffice to show such adverse possession as will make title. It might tend to show possession, but mere possession for the statutory period is not sufficient. The possession must be accompanied by a claim to the title, or at least acts tantamount to a claim of title. As said in Stevenson v. Black, 168 Mo. l. c. 560: 'Claim to ownership is essential to give to the possession an adverse character.' . . . The mere showing of possession alone is not sufficient to call into play the rule now under discussion. The very basis of a title by limitations is a claim of ownership for the statutory period. In the case at bar no attempt is made to show that Mrs. Williams had for more than five years prior to Stufflebean's deed made claim of title to this land. Possession without claim of title will not suffice to shift the burden to plaintiff."

It follows, therefore, that, upon the evidence adduced, the issue of defendant's title to the disputed tract by virtue of her claim of adverse possession for ten years should not have been submitted as a question of fact to be determined by the jury, and for that reason the trial court did not err in granting respondents a new trial of their action.

III. Did respondents show a good record title to the disputed tract in themselves? We think so. Their deed called for "all of the north one-half of Lot G, Garden Place, in Kansas City, Missouri." While the recorded plat of Garden Place shows the measurement of the distance between the center line of Howard Avenue, now 77th Street, and the south line of said Lot G to be 659.35 feet on the west line and 658.98 feet on the east line of the lot, without showing the actual measurements of the west and east lines of the lot on the plat, nevertheless the plat does show the distance between the north line of the lot and the center line of Howard Avenue to be twenty-five feet. The plat also shows and

Measurement.

designates Howard Avenue as a fifty-foot street, lying immediately north of and adjacent to platted Lot G, and recites on its face that "the streets and avenues as represented on this plat are hereby dedicated to public use forever." The record does not show any vacation or abandonment of use of the street designated on the plat as Howard Avenue. The measurement of the east and west lines of the lot as platted is determined by the simple arithmetical calculation of subtracting twenty-five feet, being half the width of Howard Avenue, from the measurements shown on the plat to be the distance from the center line of Howard Avenue to the south line of the lot. By dividing the distances thus found by two, the true dividing line between the north and south halves of the lot is definitely and accurately determined. The true dividing line is, therefore, a line extending across the lot from a point in the west line of the lot, equidistant 317.17 feet from the north and south lines of the lot, as platted, to a point in the east line of the lot equidistant 316.99 feet from said north and south lines. This method of determining the true dividing line comports with what is said in Devlin on Real Property and Deeds (3 Ed.) sec. 1020: "Where a recorded plat shows the existence of a street or alley, and land is conveyed by reference to such plat, a street or alley is necessarily excluded from the deed. The grantee is charged with notice of the streets and alleys shown by the map." [See, also, Burbach v. Schweinler, 56 Wis. 386.] The strip of land in controversy lies wholly within the bounds of the north half of said Lot G, as platted, and the record title of respondents embraces the disputed land.

The trial court committed no error in making and entering the order granting a new trial and in arrest of judgment, as we have here announced, and its order is accordingly affirmed and the cause remanded for a retrial. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.