I. E. GRIMES and Erie Grimes, Appellants,

v.

Blanche ARMSTRONG and Frank Armstrong, Respondents.

No. 45488.

Supreme Court of Missouri,
Division No. 2.

July 8, 1957.

Motion for Rehearing or for Transfer to
Court en Banc Denied Sept. 9, 1957.

Almon H. Maus, Monett, for appellants.

Royle Ellis, Cassville, for respondents.

EAGER, Presiding Judge.

This is a suit in three counts, to try and determine the title to real estate, for damages for alleged trespass, and to enjoin further trespasses. It was filed on May 13, 1955. Defendant Blanche Armstrong denied the substantive allegations, joined in the prayer for a determination of the title, and counterclaimed in ejectment. The case was tried by the court without a jury, and the findings and judgment were for defendants on plaintiffs' petition and against defendant on her counterclaim, the latter for the asserted reason that plaintiffs were not shown to be in possession of the land in question. Plaintiffs have appealed.

The dispute concerns a strip of land 34 feet wide and approximately 428 feet in depth in the town of Washburn, in Barry County. Plaintiffs, the Grimes, are admittedly the owners of Lots, 8, 9 and 10, Block 1, in Johnson and Plummers' Addition and also of 20 acres lying easterly from Lot 8; defendant Blanche Armstrong (who will hereinafter be referred to as the defendant) is admittedly the owner of Lots 1 to 4, inclusive, of Block 4 of the same addition and also of a certain unplatted portion of Block 4 lying east of those lots; these adjoin the Grimes' property on the south. · Defendant Frank Armstrong was joined because he had allegedly committed certain of the trespasses charged. The properties of the opposing parties adjoin for a distance of approximately 428 feet. The line is generally east and west, but actually runs somewhat north of west and south of east. Plaintiffs acquired their property in September, 1943, and defendant acquired hers in August, 1943. On plaintiffs' land is a brick house, a barn and perhaps other buildings; on defendant's north lot was a dwelling house, now replaced by a filling station; there was also an old barn, back perhaps 150–200 feet from the front property line, and located near the disputed north property line. These properties front westerly on a street which is actually State Highway No. 37, and will be referred to as the highway. A driveway ran back at a right angle from the highway near the south side of the plaintiffs' place for about 150 feet, then turned northward to plaintiffs' house. The

driveway is part of the disputed strip. In 1954 defendant constructed a filling station on the north part of her property and, during the course of construction, graded down a "bank" just south of the driveway; plaintiffs claim that in so doing she also destroyed several trees and that the grading has caused surface water and mud to collect in the driveway.

Plaintiffs insist that the line of an old fence just south of the driveway was and is the correct boundary; also, that they have acquired title to the ground up to that line by adverse possession, and that such line was also established as an agreed boundary line. Much of the controversy on this appeal arises from the testimony of the county surveyor who established the boundary line 34 feet north of where plaintiffs claim it to be, thus placing the disputed strip within defendant's property lines. The court found and decreed (on Count 1) that such was the correct line, and found that plaintiffs had failed to establish title by adverse possession, primarily because the driveway had been used by defendant's tenants and others and that plaintiffs' possession had not been exclusive.

We shall not attempt to state the facts in great detail. It seems reasonably clear that for some years there was a wire fence just south of the driveway which ran east from a point near the highway; this fence had certainly become much dilapidated and perhaps had even disappeared (according to some testimony) by the time plaintiffs and defendant acquired their properties. Plaintiffs rebuilt the back part of the fence, beginning at a point variously estimated as from 150 to 200 feet east of the highway and running back to the east line of Lot 8, the terminus of the joint property line; Mr. Grimes testified that this was done in the fall or early winter of 1943. Plaintiffs' witnesses and Mr. Grimes testified that this new fence was put exactly where the old fence was, but defendant and her witnesses insisted that the new fence was moved south about 10 or 12 feet, and that the work was done after September, 1947. It seems

that originally a sort of "lane" led easterly from the highway the entire depth of the respective properties, with fences on both north and south and with gates leading to each side, the latter being about where the barns were located. However, after plaintiff Grimes moved in, he put up a cross fence east of the turn in the driveway, and he or his predecessors took out some or all of the north fence of the "lane." Defendant's property had generally been known as the "Warren" place; various tenants lived on it or used the ground. According to various witnesses, the respective tenants, and others, used the now controverted driveway to go into the back part of the Warren place, including the barn, first through a gate and later simply through an open space where the fence had been. In other words, there had been for many years a sort of joint use of the "lane" and driveway. There was no evidence that any of these people ever actually asked plaintiffs or their predecessors in title for permission to use it; all said that there never was any objection to the use. Mr. Grimes testified that he planted a few small trees along the south side of the driveway (which others denied), that he put gravel on it, and that he always "claimed" the land up to the old fence. There was no evidence, however, of any discussion of the location of the property line by anyone until about 1954 when defendant had a survey made, with the single exception that defendant objected when, as she said, Mr. Grimes moved the rear part of the fence over "on her." Grimes testified that he rebuilt that fence in 1943, whereas defendant testified that it was after September, 1947. There was some evidence that in years long past the old fence had been maintained jointly by the then adjacent owners. Defendant testified specifically that she did not know where the property line was. Other facts will be referred to in the discussion which follows.

■ The court specifically fixed a boundary line which placed the controverted 34-foot strip within defendant's

property lines. While the question has not been raised by the parties, we first consider the question of our jurisdiction. In many cases this court has considered whether or not title to real estate was involved in a constitutional sense, and the question has often been troublesome. Ordinarily, title is not involved where there is merely a dispute over the location of a boundary line. City of Marshfield v. Haggard, Mo., 300 S.W.2d 419. Here, however, the real controversy involves a specific 34-foot strip of ground; plaintiffs and defendant each claimed, respectively, that this was within their or her property lines, but plaintiffs also claimed title to that particular tract by adverse possession; the trial court made a specific finding on the latter question, and adjudicated the title to the strip in question. The situation is somewhat similar to that in the case of Klaar v. Lemperis, Mo., 303 S.W.2d 55, and we have determined that title to real estate is involved. See, also, Albi v. Reed, Mo., 281 S.W.2d 882.

Plaintiffs' first three points, though variously expressed, assert error in the admission of the testimony of County Surveyor Brock and of his survey; also, in permitting him to testify that he commenced his survey from "a section corner." The argument is that his basic statements were conclusions, that he had not established the corner from the government field notes, and that he had not complied with the requirements of Section 60.290 RSMo 1949, V.A.M.S., providing a means of establishing "decayed or destroyed section corners," sometimes referred to as lost corners. The plat of the addition in question is based upon the section corner of Sections 27, 28, 33 and 34 in Township 22, Range 28 west. At this point it becomes necessary to outline, briefly, the testimony of Mr. Brock. He was the only surveyor who testified; he had made a survey for the purpose of locating this property line in 1954, but the exhibit showing the result of that survey was excluded upon the objections of counsel for plaintiffs. After hearing most of the evidence, the court continued the case to permit the defendant an opportunity to procure a new survey. Counsel for plaintiffs objected to this procedure, but the action taken was certainly within the legitimate limits of the court's discretion. Mr. Brock, therefore, testified on two occasions; he had been county surveyor for 8 years. The plat of his last survey was admitted. In substance, he testified: that he started at a corner which he "knew" was a government quarter section corner; that he had previously made surveys from that corner, and that he had found other corners from it which checked properly with the "field notes"; that this particular quarter corner was located two and one-half miles west of the section corner now in question; that he ran a line east four and one half miles to another corner which he knew, and where there was an established point, made his correction of the variation, and surveyed back 2 miles to where he found the section corner of Sections 27, 28, 33, 34; that he found the "monument" of this section corner in a black top road, by digging down in the road; that this was a sandstone of stated size; that in locating the section corner he referred to the original government field notes, which he produced at the trial, and which were part of his official files; that the "witness trees" referred to in the notes for this particular section corner were gone; that the stone "fits" the line; that he located "witness trees" for other points (presumably from the government field notes) which he used in establishing this line; that he also compared the government field notes with the corner from which he started. A photostatic copy of the official government survey and field notes for the entire Township 22, Range 28 west, was offered and received in evidence without objection. As surveyed by Mr. Brock, the point where the section line crossed the east edge of Highway No. 37 was 20 feet north (or northerly) of the southwest corner of plaintiffs' Lot 10 (identical with the northwest corner of defendant's Lot 1), and 59 feet north of the south edge of the controverted driveway. However, for some reason, he set the stake for

the lot corners 25 feet south of the section line, thus allowing plaintiffs an additional 5 feet; this gave plaintiffs a frontage of 148 feet, which was apparently the full frontage called for by the plat. He arrived at these distances by scaling them on three different plats, two of which were official plats. The plat itself did not show the respective distances in feet. In support of their after-trial motion plaintiffs filed affidavits purporting to show that the stone so used by Mr. Brock as a section corner was an entirely different type of stone, both in constituency and size, and that there was no such stone there as described by Mr. Brock. The trial court overruled the motion and thus, in his discretion, denied the attack on Mr. Brock's veracity.

 We hold that Mr. Brock's testimony that he started from a government corner does not consist of mere conclusions; we think that the foregoing recitals of the evidence demonstrate that fact. Moreover, much of the testimony of a surveyor is actually in the nature of expert testimony, and to some extent his conclusions are permissible, when supported by facts. Mr. Brock laid a sufficient basis for the admission of the ultimate findings of his survey. His evidence, oral and written, constituted a survey by the official county surveyor, and made a prima facie case for defendant; of course, it was not conclusive and it could be overthrown by other evidence. Jones v. Eaton, 307 Mo. 172, 270 S.W. 105; Morris v. Nowell, Mo., 180 S.W.2d 717. Here plaintiffs offered no controverting evidence whatever except the after-trial affidavits. In Landers v. Thompson, 356 Mo. 1169, 205 S.W.2d 544; Klinhart v. Mueller, Mo., 166 S.W.2d 519, and Schell v. City of Jefferson, 357 Mo. 1020, 212 S.W.2d 430, relied on by plaintiffs, it was held that surveys which were not shown to have started from a government corner or, if the corner be lost, not started from a corner re-established as provided by the statute (§ 60.290) were not proper evidence. In Cordell v. Sanders, 331 Mo. 84, 52 S.W.2d 834, also cited by plaintiffs, it seems that the surveyor merely assumed that there was a section corner at the crossing of two roads, and that he did not survey from or to any established corner to check it; the court held, and properly so, that the result of such a survey was insufficient because consisting merely of assumptions and conclusions. We do not have that situation here. There is here substantial evidence, which the trial court evidently believed, that Brock's survey did start from a government corner. That being true, the statute on establishing lost corners (§ 60.290) has no applicability. Opperman v. La Brot, Mo. App., 283 S.W.2d 902. Mr. Brock's testimony and the record of his survey were properly admitted.

 The next point made is that the court erred in admitting a plat and notes of a survey of Section 25, Township 22, Range 28, made in 1895, because it was not affirmatively shown that the survey was made in accordance with legal requirements. This was a certified copy of a recorded survey, made by the then County Surveyor. The purpose of the offer of this exhibit was apparently to show an established corner in Section 25 to which Mr. Brock ran the eastern terminus of his line of survey. At the most, this exhibit was merely corroboratory of Brock's testimony; naturally, affirmative evidence could not be produced to show the circumstances of the making of a survey 60 years previously. Plaintiffs cite the case of Landers v. Thompson, 356 Mo. 1169, 205 S.W.2d 544, but there it was affirmatively shown that the questioned survey was improperly made, because it was not started at an established corner and there were other irregularities. It would seem that the survey now in question, being so old as not to permit of proof of its making and circumstances, and being apparently fair and complete on its face, should be admissible. Section 60.150 RSMo 1949, V.A.M.S.; State v. Turpin, Mo., 196 S.W.2d 798; Morris v. Nowell, Mo., 180 S.W.2d 717; Clark v. McAtee, 227 Mo. 152, 127 S.W. 37, 47; Schell v. City of Jefferson, 357 Mo. 1020, 212 S.W.2d 430.

But we need not decide that question. The case is here for our review de novo. Section 510.310 RSMo 1949, V.A.M.S.; Kimberly v. Presley, Mo., 245 S.W.2d 72; Been v. Jolly, Mo., 247 S.W.2d 840, and we have no hesitancy in saying that the acceptance or rejection of this exhibit would not be in any way decisive of the case. Its admission in evidence was certainly not reversible error.

Complaint is also made of the admission in evidence of a survey made by Mr. Brock in 1954. The document we have, however, is a certified copy of the recorded survey made on January 17, 18, 19, and February 7, 1956, concerning which Mr. Brock testified fully. At page 222 of the transcript the year is erroneously stated by counsel as 1954. From what we have already said the exhibit which was actually offered was properly received.

■ Counsel urge that we should reverse the case because Mr. Brock's testimony of finding a sandstone of a stated size at the section corner nearest to these lots was on a decisive point, and that it was completely contradicted by affidavits filed with plaintiffs' after-trial motion for judgment, to reopen the case, or for a new trial. The court, in its discretion, overruled that motion. There is no showing that plaintiffs asked to participate in Mr. Brock's survey, and they produced none on their own behalf. The affidavits were filed, respectively, 7 and 10 days after judgment. The question was one directly involving the credibility of Mr. Brock; we defer to the finding and ruling of the trial judge who saw him and heard him. The point is disallowed.

■ The remaining questions concern plaintiffs' alleged adverse possession and their claim of an agreed boundary. The trial court found that plaintiffs' supposed possession was not exclusive. We concur in this finding. Substantially all the former owners and tenants on the Warren (defendant's) property, as well as the employees of defendant, appear to have used the driveway, for sundry purposes. This use had started perhaps 40 years or more ago, and there seems to have been either a gate or an opening in the old fence continuously. There was considerable evidence of such user. Defendant's family, her tenants, and her employees used her barn after she acquired the property, and the only practical way to get to it was to use the driveway and cross the supposed line; her testimony and that of her daughters indicates that the barn was not abandoned until sometime after 1947; a tenant by the name of Mason apparently used the driveway and barn from about 1944 to 1947; an employee by the name of Senter testified that he fed cows at the barn in the winters of 1949 and 1950 and used the driveway then and at other times; members of defendant's family used the driveway from time to time. The barn was generally referred to as the Warren barn, and the Warrens, according to abstracts in evidence, owned the place from 1926 to 1943; it seems that over the entire period discussed, the most accessible route to the Warren barn was along this driveway. There was thus substantial testimony of such user over a long period, continuing at least to a time well within 10 years prior to the institution of this suit. This user was not factually shown to have been by permission of plaintiffs or of any of their predecessors. It is true that some witnesses said, referring to Mr. Grimes or his predecessor, that he "let us use it," or words to that effect. These statements were actually in the nature of conclusions, and no express conversations on the subject were mentioned or related by anyone. The evidence fairly established a user by defendant and her predecessors sufficiently continuous to prevent the possession of plaintiffs and their predecessors from being exclusive for any period of 10 years or more. The trial court evidently so found. In such event, we need not consider, as argued, whether defendant had herself established an independent adverse user or possession for 10 years or more, so as to divest plaintiffs of any adversely acquired title.

The trial court saw and heard the witnesses; this is a question on which we think it is particularly appropriate to defer to the finding of the trial court, and we do so, holding that exclusive possession by plaintiffs and their predecessors for a period of ten years was not established.

■ Plaintiffs had the burden of establishing every element of adverse possession, including: (a) a hostile claim, as of right; (2) actual possession; (3) open and notorious possession; (4) exclusive possession; and, (5) continuous possession. State ex rel. Edie v. Shain, 348 Mo. 119, 152 S.W.2d 174. There is at least some doubt here as to whether the claim of plaintiffs was sufficiently "hostile," i. e., with intent to claim the ground to the actual fence line, regardless of the record title. Mr. Grimes had not discussed the boundary line with defendant until 1954. In certain of the fence line cases where title was held to have been acquired by adverse possession there had been some dispute regarding the line, or some overt act or notice of an actual, existing intent to claim specific land, regardless of record title. On the other hand, where one only means to claim to the true line, and is mistaken about the boundary, his possession is generally held not to be adverse. See, in general: Ackerman v. Ryder, 308 Mo. 9, 271 S.W. 743; Bell v. Barrett, Mo., 76 S.W.2d 394; Courtner v. Putnam, 325 Mo. 924, 30 S.W.2d 126; Welsh v. Brown, 339 Mo. 235, 96 S.W.2d 345; Foard v. McAnnelly, 215 Mo. 371, 114 S.W. 990; State ex rel. Edie v. Shain, 348 Mo. 119, 152 S.W.2d 174. Since plaintiffs have failed to establish the exclusiveness of their possession, we need not adjudicate this additional question, which has often been troublesome to our courts.

■ The driveway in question ran back on this strip a distance of perhaps 150–175 feet from the highway. The principal user which prevented plaintiffs' possession from being exclusive, was of this driveway. However, plaintiffs pleaded and tried their case as one involving the title to the entire 34-foot strip, running from the west property lines to the east line of their Lot 8, a depth of approximately 428 feet. They could not change their trial theory here, and, indeed, counsel do not ask us now to differentiate between the east and west parts of the strip in question. Under these circumstances, we decline to consider separately the question of a possible adverse possession of the east part of the strip.

■ Plaintiffs also say that in any event we should hold that their own use of the driveway "ripened into an easement," even though we may find that the strip belongs to the defendant. The difficulty with that contention also lies in the fact that the case was not presented or tried on any such theory. Plaintiffs sought to establish in themselves full fee-simple title to the strip in question; the trial court had no opportunity to pass upon any contention of an easement, and certainly did not adjudicate it. And, the theory of an easement is not entirely consistent with a claim of full title. Plaintiffs cite the case of Lortz v. Rose, 346 Mo. 1212, 145 S.W.2d 385, to the effect that equity will ordinarily retain jurisdiction until the rights of the parties are fully adjudicated; there the trial court had passed upon the issue in question and had granted the relief to which plaintiff objected. We decline to consider the question at this stage.

■ The remaining question is the contention that there was an agreed boundary line. We note here, again, that Mr. Grimes and the defendant never discussed the boundary line until 1954; they certainly did not agree on anything then. The defendant testified definitely that she did not know where the boundary line was. Plaintiffs rely principally on the maintenance of the old fence by adjacent owners, and the fact that none of defendant's predecessors had actually made any claim to property beyond the fence. Actually the statements that those owners did not "claim" beyond the fence, are in the nature of conclusions, particularly when coming from others.

The exact nature of the "claims," pro and con, under such circumstances is often a matter submerged in obscurity and doubt, unless a boundary dispute has actually arisen. The trial court did not expressly pass on this contention, although it was pleaded. The necessary inference is that the court decided the issue adversely to plaintiffs. Counsel cite the cases of Stumpe v. Kopp, 201 Mo. 412, 99 S.W. 1073, and Martin v. Hays, Mo., 228 S.W. 741. In the Stumpe case a new fence line was recognized as the boundary for years after a dispute or disputes had occurred, and after a somewhat informal "field court" was held to settle the question; thereafter new disputes arose. The court recognized the line as thus established and further held that an agreement settling a disputed boundary line may be shown by conduct, acts and long acquiescence and recognition of the line, where such justify an inference of a prior agreement. The same is generally true of the Martin case, where disputes had certainly occurred, a survey had been made, and a new fence constructed on a different line. It is also to be noted that in those cases the user and possession up to the fence on each side was apparently exclusive. Under all the circumstances here we do not feel that the evidence justifies a fair inference that the line of the old fence was agreed upon as the boundary. Much of what we have said on the subject of adverse possession is also applicable here. And see: Ackerman v. Ryder, 308 Mo. 9, 24, 271 S.W. 743; Foard v. McAnnelly, 215 Mo. 371, 114 S.W. 990.

The court dismissed plaintiffs' second count, which sought damages for trespasses on the strip in question; it necessarily follows from the foregoing that there could be no trespasses by defendants on land which one of them owned; no point is made here of the mode of disposing of that count. The third count sought an injunction against future trespasses; under the circumstances its dismissal was proper. The court found the issues for plaintiffs on, and dismissed, the counterclaim of defendant in ejectment; therein it was alleged that plaintiffs were unlawfully withholding from defendant the possession of the 34-foot strip "except 177 feet off the west end * * *." This description was obviously drawn so as to apply to that part of the strip where Mr. Grimes had allegedly moved the fence southward. The finding and dismissal were made for the asserted reason that defendant had failed to show that plaintiffs were in possession. Defendant has not appealed, and we may not review that ruling.

Upon the whole record, the judgment should be affirmed. It is so ordered.

All concur.